Gene L. KREIDER and Estate of Berniece L. Kreider, Deceased, Gene L. Kreider, Executor, Petitioners-Appellants,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent-Appellee.

No. 84–2070.

United States Court of Appeals, Seventh Circuit.

Argued April 9, 1985.

Decided May 28, 1985.

David T. Lumerman, John J. Vassen Professional Corp., Belleville, Ill., for petitioners-appellants.

Michael L. Roach, Asst. Atty. Gen., Tax Div., Dept. of Justice, Washington, D.C., for respondent-appellee.

Before WOOD and FLAUM, Circuit Judges, and PELL, Senior Circuit Judge.

FLAUM, Circuit Judge.

Petitioner-appellant Gene L. Kreider, individually and as executor of the estate of his deceased wife, Berniece L. Kreider, appeals from a decision of the United States Tax Court characterizing a $631,383.80 payment that the Kreiders received in 1977 upon the sale of their trucking company. The issues presented on appeal are: (1) whether the payment in question constituted consideration for the Kreiders' stock in the company, consideration for a covenant not to compete, or compensation for personal services; and (2) if the payment was consideration for a covenant not to compete, whether it qualified as personal service income under the maximum tax provisions of I.R.C. § 1348.[1] The Tax Court allocated one-third of the payment to compensation for services and two-thirds to the covenant not to compete, and further held that the portion allocated to the covenant not to compete did not qualify as personal service income under section 1348. *Kreider v. Commissioner,* 47 T.C.M. (CCH) 1071 (Feb. 13, 1984). We affirm the Tax Court's decision.

## I.

On October 27, 1977, Gene and Berniece Kreider sold all of the outstanding stock (200 shares) of Kreider Truck Service, Inc., an Illinois corporation, to Joseph R. Behnken, the president of Behnken Truck Service, Inc. At the time of the sale, the Kreiders were the sole shareholders of Kreider Truck Service and Gene Kreider had served as president of the trucking company for 43 years.

The sale of Kreider Truck Service was carried out pursuant to a sales agreement that the parties had entered into on Sep-

---

1. Unless otherwise noted, all section references are to the Internal Revenue Code of 1954, as amended and in effect during the tax year in issue.

tember 9, 1976. The agreement provided that the Kreiders would sell all of the outstanding stock of Kreider Truck Service to Behnken for $1.2 million. The selling price of $1.2 million was based upon the adjusted book value of the stock as of December 31, 1975. Paragraph 1(a) of the agreement provided that if the company incurred a loss between December 31, 1975, and the date of closing (which turned out to be October 27, 1977), the amount of the loss would be deducted from the $1.2 million selling price. In the event of such a loss, however, Mr. Kreider had the right to void the entire agreement unless Behnken agreed to waive that provision.

If, on the other hand, Kreider Truck Service made a profit between December 31, 1975, and the date of closing, paragraph 8 of the sales agreement provided for the payment of an amount in addition to the $1.2 million sale price. The primary issue in this case is the characterization, for tax purposes, of the payment made to the Kreiders pursuant to paragraph 8.

Paragraph 8 was entitled "Covenant Not To Compete From Sellers And Additional Compensation." Subparagraph (a) provid-ed that the Kreiders would not compete with Behnken, either directly or indirectly, for a period of three years after the date of closing. Subparagraph (b) provided that "[i]n consideration for" the covenant not to compete, Behnken would pay the Kreiders an amount equal to the accumulated after-tax profit of Kreider Truck Service for the period from December 31, 1975, to the date of closing.

Subparagraph (c) of paragraph 8 provided that in addition to the $1.2 million sale price, the Kreiders "shall retain the right to pay themselves as compensation or as a covenant not to compete" the net before-tax profit (or the after-tax profit if the compensation paid under this subparagraph resulted in a tax deduction for the company) earned by the company from December 31, 1975, to the date of closing. To confuse matters still further, subparagraph (e) provided that the total amount of the additional payment to be made to the Kreiders under paragraph 8 would not exceed the net before-tax profit earned by the company from December 31, 1975, to the date of closing.[2] A supplemental agreement

---

2. The relevant portions of paragraph 8, as supplemented and amended, provided that:

(a) The Sellers agree that during the period commencing on the closing date as set forth in the Agreement and ending at the expiration of three (3) years from said closing date, they will not compete directly and/or indirectly with KREIDER or the BUYER as a bulk carrier in the areas, counties, and/or states where KREIDER and/or the BUYER operate.

That the phrase "to compete directly or indirectly" shall mean, in addition to the normal meanings of the words used therein, that the Sellers shall not disclose lists of customers, rates, inside information or any other pertinent information to any direct or indirect competitor of KREIDER or the BUYER; the BUYER will not hold SELLERS responsible for any information which can be obtained from public records, such as published tariffs, exhibits of operating authorities, etc.; and that the SELLERS shall not own directly or indirectly any stock or any interest in any direct or indirect competitor of KREIDER or the BUYER. That notwithstanding this Paragraph 2 [sic], SELLERS shall be free to seek employment in the transportation industry which is not in the bulk commodities business competition with KREIDER. SELLERS are also permitted to buy stock in any transporta-tion business listed on any public stock exchange.

(b) In consideration for the SELLERS covenanting not to compete the BUYER agrees to pay to the SELLERS an amount equal to the accumulated after-tax profit of KREIDER determined in accordance with the Internal Revenue Code and all rules and regulations promulgated thereunder for the said period from 12–31–75 to closing to be paid on or before closing in cash. . . .

(c) In addition to the $1,200,000 to be paid for the purchase of the stock in paragraph 1 above, the SELLERS shall retain the right to pay themselves as compensation or as a covenant not to compete the net profit before taxes (unless the compensation to be paid herein shall represent a tax deduction for KREIDER then it shall be the net profit after taxes) made by KREIDER from December 31, 1975 through and including the date of clos-ing. . . .

.     .     .     .     .

(e) It is understood by all parties hereto that the total amount to be paid to the SELL-ERS under the provisions of paragraph 8 representing the compensation to be paid for the covenant not to compete shall not exceed an amount equal to the net before Federal and

signed by the parties on the same day provided that:

Paragraph 8 ... shall be interpreted to mean that the [Kreiders] shall receive a minimum of but no greater than the net profit before taxes, whether paid in the form of covenant not to compete and/or compensation.

On October 27, 1977, the closing date, Behnken paid the Kreiders $1.2 million for the stock of Kreider Truck Service ($348,-000 in cash and the remainder in a note payable on January 3, 1978) plus an additional $631,383.80 [3] in cash pursuant to paragraph 8. Although the parties did not specify whether the additional payment would be characterized as consideration for the covenant not to compete or as compensation for services, both parties treated the payment as consideration for a covenant not to compete on their 1977 tax returns. The Kreiders reported the payment as personal service income subject to the maximum tax provisions of section 1348.

The Commissioner found a deficiency of $75,577.80 in the Kreiders' 1977 return, based upon his determination that income from a covenant not to compete was not personal service income under section 1348. Mr. Kreider filed a petition with the United States Tax Court for a redetermination of the deficiency on March 9, 1981, pursuant to 26 U.S.C. § 6213(a) (1982). A short trial was held on September 20, 1982. Kreider argued to the Tax Court alternatively that: (1) the $631,383.80 payment should be characterized as additional consideration for the stock of Kreider Truck Service and thus treated as a capital gain, (2) the payment should be characterized under paragraph 8 as compensation for services (and thus personal service income) rather than payment for the covenant not to compete, and (3) if characterized as consideration for the covenant not to compete, the payment qualified as personal service income under section 1348. The Commissioner argued that the payment was consideration for the covenant not to compete and that it did not qualify as personal service income under section 1348.

In a thorough and well-reasoned opinion, the Tax Court first determined that the payment was not additional consideration for the stock of Kreider Truck Service. *Kreider v. Commissioner*, 47 T.C.M. (CCH) 1071, 1073 (Feb. 13, 1984). The court then refused to characterize the entire $631,383.80 payment either as compensation for services or as consideration for the covenant not to compete, finding that both the covenant and Mr. Kreider's services during the period before closing had some economic value to Behnken and that the parties thus intended some allocation to each. Because the agreement was completely silent as to the method of allocation, the Tax Court reviewed the record and concluded that one-third of the payment was allocable to compensation for services while two-thirds was allocable to the covenant not to compete. *Id.* at 1076. Lastly, the court cited a Treasury regulation expressly providing that personal service income does not include amounts received for a covenant not to compete. Treas.Reg. § 1.1348–3(a)(1)(i). The court found the regulation determinative of the final issue after holding that Kreider had failed to establish that the regulation was invalid. 47 T.C.M. at 1077.

On appeal, Kreider essentially presents the same arguments that were made to and considered by the Tax Court.

## II.

### A. Payment for the Sale of Stock

Kreider first attacks the Tax Court's holding that the $631,383.80 payment did not constitute additional consideration for the stock of Kreider Truck Service. Before we address the merits of his claim, how-

State taxes profit of KREIDER earned during the period from 12–31–75 to closing without taking into consideration the payments to be made under paragraph 8.

3. It was stipulated that this amount represented the before-tax profit of Kreider Truck Service for the period January 1, 1976, to October 27, 1977. The after-tax profit for the same period was $456,585.64.

ever, we must briefly discuss the Commissioner's contention that this holding is unreviewable on appeal.

The Commissioner argues that the Tax Court's decision on this issue is not adverse to the Kreiders because a decision in their favor would have *increased* their 1977 tax liability. Therefore, it is argued, this court has no jurisdiction to hear the appeal under the principles articulated in *W.W. Windle Co. v. Commissioner*, 550 F.2d 43, 45–46 (1st Cir.) (dismissing an appeal from the Tax Court on the ground that the Tax Court's holding was not adverse to the taxpayer in the year at issue), *cert. denied*, 431 U.S. 966, 97 S.Ct. 2923, 53 L.Ed.2d 1062 (1977). The Kreiders' 1977 tax liability would be increased if the $631,383.80 payment were treated as additional consideration for their stock in Kreider Truck Service because they would then be unable to use the installment method under section 453 of the Code in reporting their gain on the sale. As in effect in 1977, section 453 allowed a taxpayer to treat the gain on a sale or disposition of property as an installment sale if the taxpayer received no more than 30% of the gross sale price in the year of the sale. I.R.C. § 453(b). The Kreiders reported receiving $348,000 in cash in 1977 from the sale of their stock in Kreider Truck Service, or 29% of the reported gross sale price of $1.2 million. They therefore qualified for installment sale reporting. If the $631,383.80 cash payment received in 1977 were treated as additional consideration for their stock, however, the Kreiders would not have been able to report their gain on the installment basis because they would then have received $979,383.80 in payments in 1977, which would represent 53.5% of the revised gross sale price of approximately $1.83 million. Even after taking the capital gain deduction into account, the loss of eligibility for installment sale reporting would result in a substantial

increase in the Kreiders' 1977 taxable income.

Kreider concedes that their 1977 taxable income would increase if the payment in question were characterized as additional consideration for their stock. He argues, nevertheless, that he is entitled to appeal the Tax Court's decision because a decision in his favor, while increasing the Kreiders' tax liability in 1977, would decrease their overall taxable income due to the decision's effect on subsequent reporting years.[4]

■ We hold that this court has appellate jurisdiction to review the Tax Court's holding that the $631,383.80 payment was not consideration for the Kreiders' stock. The applicable jurisdictional statute provides that the United States Courts of Appeals "shall have exclusive jurisdiction to review the *decisions* of the Tax Court...." 26 U.S.C. § 7482(a) (1982) (emphasis added). A decision of the Tax Court is any "formal determination of the existence or nonexistence of a deficiency." *W.W. Windle*, 550 F.2d at 45; *see also* 9 J. Mertens, *Law of Federal Income Taxation* § 51.13 (1982). The Commissioner relies upon *W.W. Windle* as support for his contention that this part of the Tax Court's decision is unreviewable. In *W.W. Windle*, however, the holding being appealed was immaterial to the Tax Court's decision because a contrary outcome on that particular issue would not have affected the amount of the deficiency either way. 550 F.2d at 44. The court thus held that it did not have jurisdiction over the appeal. *Id.* at 45. In contrast, the Tax Court's holding in this case that the $631,383.80 payment was not additional consideration for the stock of Kreider Truck Service was an essential step in the court's analysis of the character, for tax purposes, of the payment under paragraph 8. A finding in favor of Kreider on this issue would definitely have affected the amount of the deficiency and thus the ultimate decision of the Tax Court.

---

4. In order to realize the tax savings from this decreased overall taxable income, Kreider would presumably have to file amended returns and obtain refunds for any subsequent reporting years affected by the decision, since the

Kreiders reported the $631,383.80 payment in 1977 as consideration for the covenant not to compete rather than as consideration for their stock in Kreider Truck Service.

■ The question remains, however, whether appellate jurisdiction over this part of the Tax Court's decision is nevertheless foreclosed because a different outcome would have increased, rather than decreased, the amount of the taxpayer's deficiency for the 1977 tax year. Although the plain language of section 7482(a) does not appear to so restrict our authority, we find it unnecessary to decide, in the abstract, whether a taxpayer should be allowed to argue for an increased deficiency in a case where only the single tax year at issue would be affected by the court's decision. Realistically, the only time a taxpayer would argue for an increased deficiency (and the only time the Commissioner would oppose) is in a case like the present one where the court's resolution of an issue causes an increased tax liability for the year directly involved in the case but a *decreased* tax liability overall due to the decision's binding effect on other reporting years.

■ Although the general rule is that each tax year gives rise to a separate cause of action, the collateral estoppel doctrine will apply when the precise facts, rights, questions, or issues decided on the merits and essential to the judgment in one case are presented for adjudication in the second. *See generally* 10 J. Mertens, *Law of Federal Income Taxation* § 60.25 (1984); *W.W. Windle*, 550 F.2d at 46; *Walter Wilson Flora v. Commissioner*, 47 T.C. 410, 413–14 (1967). In *W.W. Windle*, for example, the Tax Court's holding that the taxpayer sought to appeal would have had no binding effect on the taxpayer for other reporting years because the holding was unnecessary to the Tax Court's decision on the amount of the deficiency. 550 F.2d at 46. In this case, on the other hand, the Tax Court's holding that the $631,383.80 payment was not consideration for the Kreiders' stock was a material and necessary part of the Tax Court's decision characterizing the payment as something else.

The precise facts and issues would be presented if, after losing in this case, Kreider filed an amended return for 1978 and claimed a refund on the ground that the payment should be treated as consideration for the stock of Kreider Truck Service rather than as characterized by the Tax Court in the instant litigation. Similarly, if this case were decided in Kreider's favor, the precise facts and issues would be presented if the Commissioner decided to contest the amended returns that Kreider would then file for subsequent tax years (*see supra* note 4) on the ground that the payment should be treated solely as consideration for the covenant not to compete.

A case almost directly on point is *Lea, Inc. v. Commissioner*, 69 T.C. 762 (1978), where a prior decision of the Court of Claims allocating the amount realized on the sale of a company between a covenant not to compete and good will was held to collaterally estop the taxpayer from relitigating the issue for subsequent reporting years. *Id.* at 770. We believe that both Kreider and the Commissioner would be similarly barred from relitigating for subsequent reporting years the tax consequences to the Kreiders of the payment received under paragraph 8.[5] In sum, we believe that the Tax Court's holding should be viewed in light of its binding effect on the Kreiders' subsequent tax years. In that light, the Tax Court's decision increased the Kreiders' overall tax liability and is thus adverse to them. We therefore hold that we have jurisdiction to hear Kreider's appeal from the Tax Court's entire decision, including this first issue.

Turning to the merits of Kreider's appeal, we believe that the Tax Court correctly held that the $631,383.80 payment was not additional consideration for the Kreiders' stock based on paragraph 8's characterization of the payment as either compensation for services or as consideration for

---

5. We express no view as to whether this decision would have collateral estoppel effects as to Behnken.

the covenant not to compete.[6] The court first discussed the burden of proof on a party seeking to establish that the intent of the parties is other than that expressed in their contract, applying the "strong proof" standard favored by the Tax Court and enunciated in *Major v. Commissioner:*

> [W]here one alleges that an allocation is actually other than that contained in a contract, that party must prove it beyond a mere preponderance of the evidence— he must present "strong proof" that the allocation is correct based on the intent of the parties and the economic realities.

76 T.C. 239, 247 (1981). Kreider argues that the Tax Court erred in applying the strong proof standard because that standard was not used in a 1955 decision of this circuit. *See Golsen v. Commissioner,* 54 T.C. 742, 756–57 (1970) (Tax Court bound to apply law of circuit to which appeal of decision would lie), *aff'd,* 445 F.2d 985 (10th Cir.), *cert. denied,* 404 U.S. 940, 92 S.Ct. 284, 30 L.Ed.2d 254 (1971). In 1955, this circuit held that

> in tax matters we are not bound by the strict terms of the agreement; we must examine the circumstances to determine the actualities and may sustain or disregard the effect of a written provision or of an omission of a provision, if to do so best serves the purposes of the tax statute.... Therefore, it was the duty of the tax court and is our duty here to ascertain the true intent, insofar as tax consequences are concerned. Consequently, it is immaterial whether the contract did or did not define a specified amount as the value of the covenant.

*Wilson Athletic Goods Manufacturing Co. v. Commissioner,* 222 F.2d 355, 357 (7th Cir.1955). Kreider asserts that this circuit therefore looks to the "true intent" of the parties to determine the substance of a transaction rather than looking to the strict terms of the agreement. In *Wilson Athletic Goods,* however, the issue was whether the parties had properly allocated a payment under the contract between good will and a covenant not to compete when the contract was completely silent on the issue. The contract in that case provided for the sale of a company at a total purchase price of $570,000, comprising $270,000 for current assets, $157,300 for machinery, equipment, and other fixed assets, and an additional payment of $142,700. *Id.* at 356. The contract did not state the purpose of this additional payment. The taxpayer entered upon its books the following allocation: $132,700 to the covenant not to compete and $10,000 to good will. *Id.* The Commissioner argued, and the Tax Court agreed, that nothing should be allocated to the covenant not to compete because the contract did not expressly segregate the $132,700 from the total purchase price as the amount attributable to the covenant. *Id.* at 357. This court reversed, as quoted above. In view of the contract's silence as to the purpose of the additional $142,700 payment, this court held that it would look beyond the contract to determine whether the covenant not to compete had value and, if so, the amount thereof. *Id.*

The case cited by Kreider as support for his contention that this circuit does not follow the strong proof standard is therefore not a case in which the Tax Court would even apply that standard. The strong proof standard applies only when a party is seeking to establish that the parties intended something other than what is specifically stated in their contract, as Kreider is attempting to do here. *See Peterson Machine Tool, Inc. v. Commissioner,* 79 T.C. 72, 81–82 (1982). *Wilson Athletic Goods,* on the other hand, was a situation like that discussed in the following section where a party is merely seeking to construe a silent or ambiguous provision in the contract. A lesser burden of proof is imposed in the latter situation. *See Peterson Machine Tool,* 79 T.C. at 82. Thus, it

---

**6.** For purposes of this analysis, the items in paragraph 8 will be discussed as a unit. The question whether the payment under paragraph 8 should be characterized as compensation for services or as consideration for a covenant not to compete will be discussed in the following section.

appears that even if this court had discussed the different burdens of proof in *Wilson Athletic Goods*, we would not have applied the strong proof standard on the facts of that case.[7]

■ In short, *Wilson Athletic Goods* does not support Kreider's contention that this circuit has rejected the strong proof standard. Our emphasis in *Wilson Athletic Goods* on the intent of the parties and economic realities is not at all inconsistent with approval of the strong proof standard, since the strong proof standard focuses on the same factors. *See Major v. Commissioner*, 76 T.C. at 247. We therefore hold that the Tax Court did not err in using the strong proof standard in this case under the assumption that it would be acceptable to this circuit. *See Kreider v. Commissioner*, 47 T.C.M. at 1074 n. 4; *see also Major v. Commissioner*, 76 T.C. at 249 (applying strong proof standard in case appealable to this circuit).

Under the strong proof standard, Kreider must present strong proof that the $631,383.80 payment under paragraph 8 was intended by the parties to be additional consideration for their stock rather than what paragraph 8 says it is. The Tax Court found that the contract clearly provided that $1.2 million would be paid for all right, title, and interest in the Kreiders' stock. Kreider presented no evidence that the parties intended to allocate to the stock price more than the amount stated in the contract, and presented no persuasive evidence that the $1.2 million sale price was inadequate or that allocating the additional payment to compensation for services or to the covenant not to compete would not comport with economic reality. The Tax Court's decision is supported by both parties' treatment of the additional payment on their 1977 tax returns as attributable to the covenant not to compete rather than to the sale price of the stock.

■ Kreider argues that the parties always intended the additional payment under paragraph 8 to be additional consideration for the stock of Kreider Truck Service, and cites as support the allegedly corresponding provisions in paragraphs 1(a) and 8 of the sales agreement. Just as any losses sustained by the company during the period from December 31, 1975, to the date of closing were to be subtracted from the $1.2 million sale price under the provisions of paragraph 1(a), he argues, the additional payment under paragraph 8 represented any profits earned by the company during the same period and thus reflected the increased value of the stock. The weakness in this argument is that the Kreiders were not bound by the provisions of paragraph 1(a); if the company sustained a loss during the period from December 31, 1975, to the date of closing and if Behnken insisted upon reducing the sale price by that amount, the Kreiders could have voided the entire agreement. Thus, the agreement ensured that the Kreiders would receive *no less than* $1.2 million for their stock unless they chose to submit to the provisions of paragraph 1(a). We believe that the Tax Court correctly held that paragraphs 1(a) and 8 were not intended by the parties to be correlating provisions for the adjustment of the sale price of the stock between December 31, 1975, and the date of closing.

In sum, we affirm the Tax Court's holding that the $631,383.80 payment received by the Kreiders under paragraph 8 was not intended by the parties to be additional consideration for their stock in Kreider Truck Service.

## B. Compensation for Services versus Covenant Not to Compete

The second question on appeal is whether the Tax Court erred in holding that the additional payment received under paragraph 8 was allocable in part to the covenant not to compete. Paragraph 8, as seen earlier, is highly ambiguous as to the char-

---

7. Perhaps one reason why the different burdens of proof were not discussed in *Wilson Athletic Goods* is that the strong proof standard was not really developed until several years later, in *Ullman v. Commissioner*, 264 F.2d 305, 308 (2d Cir.1959). *See Major v. Commissioner*, 76 T.C. 239, 249 n. 9 (1981).

acterization of the payment to be made under its provisions. Subparagraph (b) provides that the payment is "[i]n consideration for" the covenant not to compete. Subparagraph (c) provides that the payment is either compensation for services or consideration for the covenant not to compete. Subparagraph (e) and the supplemental agreement impose a ceiling on the total amount to be paid under paragraph 8 that is equal to the amount calculated under either of subparagraphs (b) or (c).

■ Where the allocation in a contract is ambiguous, as here, and the parties merely seek to construe its terms in the light most favorable to their respective causes, the strong proof standard does not apply. *Peterson Machine Tool*, 79 T.C. at 82. Rather, the parties bear the burden of proving their respective interpretations by a mere preponderance of the evidence. *Id.* Kreider argued before the Tax Court that the paragraph 8 payment should be characterized under subparagraph (c) entirely as compensation for his services.[8] The Tax Court agreed that allocation of some of the $631,383.80 payment to compensation for services would comport with the parties' intent and economic reality:

> Testimony at trial revealed that the period between the date of the first agreement and the final closing would be a crucial one for Kreider Truck Service. The closing hinged upon approval from various transportation authorities of permit transfers, a process which required hearings of unknown duration. Mr. Kreider testified that he knew that certain permits he had been seeking to acquire for ten years were to be granted during this period. Good business sense logically would impel the buyers to provide Mr. Kreider with the incentive to put forth his best efforts during this crucial period to exploit these new opportunities.

47 T.C.M. at 1075. In addition, the formula under which the payment was to be computed was based upon the time period in which Kreider performed these services. The Tax Court thus held that Kreider had established by a preponderance of the evidence that at least *some* of the payment under paragraph 8 was allocable to compensation for services.

The Tax Court also held, however, that the Commissioner had met his burden of establishing by a preponderance of the evidence that at least some of the payment was allocable to the covenant not to compete. The covenant, contained in subparagraph (a) of paragraph 8, was very detailed and specific, indicating that the parties thought it important. *See supra* note 2 (containing text of the covenant). The Tax Court concluded that:

> The terms of the covenant thus reveal that the parties did not doubt its importance. This, coupled with the fact that Mr. Kreider had long experience in the industry and represented a formidable competitive force leads us to conclude that the covenant had significant economic value. Moreover, the language of paragraph 8 indicates that *some* allocation to the covenant was indeed intended although it does not make clear the specific amount.

47 T.C.M. at 1075.

Kreider argues that nothing should be allocated to the covenant not to compete because it lacked economic substance. Kreider testified before the Tax Court that he would have agreed to the covenant without any consideration because he had planned to retire. The Tax Court attached little weight to Kreider's testimony, however, finding no evidence that the Kreiders had informed Behnken during negotiations that they would be willing to agree to the covenant without consideration. On the contrary, the evidence supported the conclusion that the covenant not to compete was part of the bargained for consideration. Furthermore, even if Kreider planned to retire in 1977, it could not be

---

**8.** Gene Kreider operated Kreider Truck Service from the date of the sales agreement until the date of closing, working about 13 hours a day, 6 days a week, and some Sundays. During this period, he continued to receive his regular salary.

said that the covenant completely lacked economic substance; Behnken would still have valued the covenant as protection against the possibility that Kreider would decide not to retire after all.

Kreider next argues that the covenant not to compete lacked economic substance because of the possibility that there would be no consideration for the covenant if the company failed to produce net earnings during the period from December 31, 1975, to the date of closing. The Tax Court was not convinced that this fact alone demonstrated that the covenant had no economic value:

> It is true that the payment formula in paragraph 8 of the agreement could have produced no compensation for the covenant. In that event, however, no payment under that clause would have been made. Moreover, Mr. Kreider's testimony indicates that he fully anticipated substantial net earnings during the period at issue because he knew that certain permits he had been pursuing for 10 years were about to be granted. Moreover, paragraph one of the agreement gave Mr. Kreider the right to void the entire agreement in the event of a loss (under certain circumstances); thus the only way Mr. Kreider would have been irrevocably bound by the covenant without receiving compensation would have been if net earnings had been exactly zero.

47 T.C.M. at 1076–77.

█ The Tax Court concluded, and we agree, that some allocation of the $631,-383.80 payment both to Mr. Kreider's services and to the covenant not to compete was both intended and economically reasonable. In making the actual allocation, the court made the closest approximation it could since complete accuracy was impossible. *See Levine v. Commissioner,* 324 F.2d 298, 302 (3d Cir.1963) (affirming Tax Court's allocation between good will and covenant not to compete when both items

deemed valuable and complete accuracy impossible); *Peterson Machine Tool,* 79 T.C. at 86 (allocating portion of company's purchase price to covenants not to compete); *Kinney v. Commissioner,* 58 T.C. 1038, 1044–45 (1972) (same). Kreider does not argue on appeal that the Tax Court's allocation of one-third of the payment to compensation for services and two-thirds to the covenant not to compete is unreasonable other than by repeating his argument that nothing should be allocated to the covenant not to compete. We have, however, already disposed of that argument. We do not find the Tax Court's allocation clearly erroneous, and therefore affirm the court's decision allocating one-third of the $631,-383.80 payment to compensation for services and two-thirds to the covenant not to compete.

## C. Personal Service Income

Kreider's final argument is that the two-thirds of the $631,383.80 payment allocated to the covenant not to compete should be deemed personal service income under the maximum tax provisions of section 1348.[9] Section 1348, for all times relevant to this case, provided that the tax on a taxpayer's "personal service income" would be no higher than 50%. The term "personal service income" was defined to include all of the taxpayer's earned income plus certain amounts received as a pension or annuity under an employee retirement plan. I.R.C. § 1348(b)(1)(A).

In making the argument that compensation for the covenant not to compete is personal service income, Kreider must contend with the following Treasury regulation:

> For purposes of section 1348 and the regulations thereunder, the term "earned income" . . . does not include such income as dividends . . ., other distributions of corporate earnings and profits,

9. The maximum marginal individual income tax rate in 1977 was 70%. Section 1348 provided for a maximum marginal rate of 50% on personal service, or earned income. Section 1348 was repealed by the Economic Recovery Tax Act of 1981, which reduced the maximum marginal tax rate on all types of income to 50% effective for taxable years beginning after December 31, 1981. Pub.L. No. 97–34, § 101(c), 95 Stat. 183 (1981).

gambling gains, or gains which are treated as capital gains under any provision of chapter 1. *The term also does not include amounts received for refraining from rendering personal services or engaging in competitive activity* or amounts received as consideration for the cancellation of an employment contract.

Treas.Reg. § 1.1348–3(a)(1)(i) (emphasis added). Because this regulation expressly provides that amounts received for a covenant not to compete are not personal service income, Kreider's claim to the contrary must fail unless the regulation itself is invalid.

■ The standard of review when a Treasury regulation is challenged was set forth in *Commissioner v. South Texas Lumber Co.:*

> This Court has many times declared that Treasury regulations must be sustained unless unreasonable and plainly inconsistent with the revenue statutes and that they constitute contemporaneous constructions by those charged with administration of these statutes which should not be overruled except for weighty reasons.

333 U.S. 496, 501, 68 S.Ct. 695, 698, 92 L.Ed. 831 (1948). *See also Commissioner v. Portland Cement Co.,* 450 U.S. 156, 169, 101 S.Ct. 1037, 1045, 67 L.Ed.2d 140 (1981) (courts must defer to Treasury regulations that "implement the congressional mandate in some reasonable manner") (quoting *United States v. Correll,* 389 U.S. 299, 307, 88 S.Ct. 445, 450, 19 L.Ed.2d 537 (1967)); *Northern Illinois Gas Co. v. United States,* 743 F.2d 539, 542 (7th Cir.1984). Kreider argues that consideration for a covenant not to compete is attributable to a

person's prior labor and accumulated experience and is thus similar to other types of income deemed personal service income under section 1348, including amounts received as a pension or annuity, bonuses, prizes and awards in recognition of personal services, and gains and net earnings from the disposition of property created by personal efforts. *See* I.R.C. § 1348(b)(1)(A); Treas.Reg. § 1.1348–3(a)(1)(i). Although finding this a plausible policy argument, the Tax Court properly held that it was insufficient to establish that the regulation at issue was "plainly inconsistent" with section 1348. Section 1348 defined the term "personal service income" as, *inter alia,* "any income which is earned income within the meaning of ... section 911(b)...." Section 911(b), in turn, defined "earned income" as "wages, salaries, or professional fees, and other amounts received as compensation for personal services *actually rendered*" (emphasis added). Furthermore, Kreider's argument that payment for a covenant not to compete is compensation for prior labor and is thus similar to some types of income included under section 1348 overlooks the fact that other types of income received as an indirect result of prior labor, such as most investment income, are not included under section 1348.

In sum, we agree with the Tax Court's finding that Kreider has failed to establish that the Treasury regulation at issue is unreasonable or plainly inconsistent with section 1348. We accordingly affirm the court's conclusion that the amount received by the Kreiders under paragraph 8 as consideration for the covenant not to compete is not personal service income and thus does not qualify for maximum tax treatment under section 1348.[10]

10. Kreider's counsel raised for the first time at oral argument the claim that section 1.1348–3(a)(1)(i) of the Treasury regulations should not apply to the Kreiders because the portion on covenants not to compete appeared for the first time in the final rule promulgating the regulation. *See* 41 Fed.Reg. 55,336, 55,339 (Dec. 20, 1976). Because the Kreiders fashioned their September 1976 agreement in reliance on the proposed regulations to section 1348 (*see* 36 Fed.Reg. 23,817 (Dec. 15, 1971)), he now argues, and because the proposed regulations contained no language on covenants not to compete, we should protect the parties' justified expectation that the payment under paragraph 8 of their agreement would qualify as personal service income. Because this argument was not presented to the Tax Court, however, we simply cannot address it on appeal. *See Hormel v. Helvering,* 312 U.S. 552, 556, 61 S.Ct. 719, 721, 85 L.Ed. 1037 (1941). Even if we were to accept

## III.

In conclusion, we affirm the Tax Court's holdings that: (1) the $631,383.80 payment received by the Kreiders under paragraph 8 of their sales agreement with Behnken was not additional consideration for their stock, (2) the payment is allocated one-third to compensation for services and two-thirds to the covenant not to compete, and (3) the portion allocable to the covenant not to compete is not personal service income under the maximum tax provisions of section 1348.

See also, D.C., 555 F.Supp. 300.

the premise that a party's reliance on a proposed regulation could bind the Commissioner to the terms of the proposed regulation, we would have no way of reviewing the reasonableness and extent of the Kreiders' reliance on the proposed regulation in this case because no factual findings on this issue were made below.