GEORGE T. CRITZ and RUTHE E. CRITZ, ET AL., [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Critz v. Commissioner
Docket Nos. 10776-79; 12747-79; 12748-79.
United States Tax Court
T.C. Memo 1987-538; 1987 Tax Ct. Memo LEXIS 530; 54 T.C.M. (CCH) 947; T.C.M. (RIA) 87538; October 21, 1987. *530 John J. O'Brien, for the petitioners in docket No. 10776-79. Israel J. Herzog, for the petitioners in docket Nos. 12747-79 and 12748-79. Mary P. Hamilton, for the respondent. RAUM
MEMORANDUM FINDINGS OF FACT AND OPINION RAUM, Judge: The Commissioner determined deficiencies in petitioners' income tax as follows: Docket No.
Petitioner
Year
Amount
10776-79
George T. & Ruthe E. Critz
1975
$ 1,546.92
1976
1,385.51
12747-79
Kilinc A. and Ulku Erkan
1975
$ 3,176.00
1976
9,454.00
12748-79
Park Pediatric Associates, Inc.
1975
$ 929.00
1976
929.00
Two related issues are presented. [2] The first is whether any part of the sales price payable under a contract between George T. Critz as seller and Kilinc A. Erkan as buyer of Park Pediatric Associates, Inc., is properly allocable to a covenant not to compete contained in the contract. The second issue relates to the existence and effect of a subsequent assignment by Kilinc A. Erkan of the covenant not to compete to Park Pediatric Associates, Inc.
*531 FINDINGS OF FACT Some of the facts have been stipulated. The stipulation of facts and related exhibits are incorporated herein by this reference. [3]
At the time they filed their petition, George T. Critz (Dr. Critz or petitioner Critz) and Ruthe E. Critz *532 resided in Worcester, Massachusetts. At the time Kilinc A. Erkan (Dr. Erkan or petitioner Erkan) and Ulku Erkan filed their petition to this Court, they resided in Sharon, Massachusetts. Park Pediatriac Associates, Inc. (Park Pediatrics, Park, or the corporation) is, and at the time its petition was filed, was a professional corporation with its offices located in Stoughton, Massachusetts. The business of Park Pediatrics consists of the practice of medicine in the areas of general pediatrics and pediatric allergy. Petitioner Critz is a pediatrician and a pediatric allergist. Before 1973, his medical practice was organized as Park Pediatrics. At that time he was the sole shareholder of Park Pediatrics. Sometime prior to August 1972, Dr. Critz used the Woodward Medical Personnel Bureau to help him find an associate for his medical practice. In early August 1972, through Woodward, Dr. Critz received Dr. Erkan's "curriculum vitae." By August 18, 1972, Dr. Critz had offered Dr. Erkan the associate position. Dr. Erkan is a pediatrician and a pediatric allergist. He was born in Turkey in 1933. He studied medicine in Turkey, completed his internship in Turkey, and then worked as *533 a resident in pediatrics in both Turkey and England. In 1963, he came to the United States and worked in a variety of positions as a pediatrician and pediatric allergist, but then moved back to Turkey in 1969, where he was Chief of Pediatrics at a Turkish military hospital and engaged in the private practice of pediatrics. Feeling better suited to practice in the United States, he then returned to the United States in December, 1971 to seek employment. It was on his return to the United States that Dr. Erkan found the position with Dr. Critz in Park Pediatrics. Initially, Dr. Critz's representations to Dr. Erkan were that Dr. Critz intended to retire from the Stoughton practice after one or two years of their working together and that at his retirement, Dr. Critz would sell the stock of Park to Dr. Erkan. By August 26, 1972, Dr. Critz and Dr. Erkan were apparently considering a transition period of only about three months before Dr. Erkan would take over the practice. On September 8, 1972, Dr. Erkan began work as an employee of Park Pediatrics. Almost immediately, Dr. Erkan and Dr. Critz began negotiating the terms of the transfer of the stock of the corporation to Dr. Erkan. *534 John P. Davey (Davey) was the attorney representing Dr. Critz in the negotiations. Dr. Erkan was not represented by counsel. Although Dr. Critz had suggested to Dr. Erkan that he might not benefit greatly from representation by counsel, he did tell Dr. Erkan that if he had any questions he could have counsel look over the agreement. In addition, Davey advised Erkan that he should have counsel in the negotiations. Nonetheless, Dr. Erkan dealt directly with Davey and relied on Davey to explain the contract terms to him. In the negotiations, Dr. Critz (through Davey) and Dr. Erkan exchanged proposals in connection with the total purchase price to be paid for the stock and in connection with a covenant not to compete -- both its duration and geographical reach. At the time of the negotiations Davey was not aware of and thus was unable to apprise Dr. Erkan of the tax consequences that might stem from the existence in the contract of a covenant not to compete. Dr. Critz, however, had a business adviser who advised him in tax matters. On October 14, 1972, Drs. Critz and Erkan entered into an agreement which, as later amended, contained the following provisions: 1. That the SELLER *535 warrants and represents that he is the sole owner of all the issued and outstanding capital stock of Park Pediatric Associates, Inc. (hereinafter called 'PARK', a Massachusetts professional corporation with a usual place of business at 966 Park Street, Stoughton, Mass., which stock is represented by stock certificate Number # 1, for One Hundred Shares (100) hereinafter called the 'STOCK'.) 2. That the SELLER desires to sell the said STOCK, and the BUYER desires to purchase the same, in accordance with the terms and conditions hereinafter stated. 3. That the SELLER agrees to sell the STOCK and the BUYER agrees to purchase the same for the sum of Sixty Five Thousand ($ 65,000.00) [later increased to $ 67,500.00] DOLLARS as proved in a note of even date and hereinafter mentioned. The terms and conditions of the transfer provided generally for a transition period lasting until January 3, 1973, and a transfer of the stock of Park Pediatrics from Dr. Critz to Dr. Erkan at the end of the transition period. During the transition period Dr. Critz and Dr. Erkan would both "devote their full business time and attention to" their duties as "physician employees of Park". In addition, *536 Dr. Critz would "acquaint [Dr. Erkan] with as many of the patients and/or records as is feasible, and further acquaint [Dr. Erkan] with the practice of pediatric medicine in the Stoughton area." Both the stock of Park Pediatrics, and a $ 2,500 deposit placed on the stock by Dr. Erkan would be held by an escrow agent during the transition. At the end of the transition, on January 3, 1973, the agreement provided that "the ESCROWEE is authorized and directed * * * to deliver the STOCK to the BUYER." On that same date Dr. Critz was to resign as an officer and employee of Park, and Dr. Erkan was to execute a promissory note in the amount of $ 63,000 which was to be "immediately operable without offsets or deductions". The purchase price of $ 67,500 was paid in the following manner: $ 2,500 cash deposit, an assumption of a $ 2,000 debt due by the corporation to Dr. Critz, and the $ 63,000 promissory note. The note was payable in "equal ninety day installments of Two Thousand Two Hundred Fifty ($ 2,250.00) Dollars, successively beginning with April 2, 1973". Up until the transfer of the stock on January 3, 1973, Dr. Critz would "have the exclusive right to repurchase the STOCK of *537 PARK". In the event Dr. Critz repurchased the stock "the BUYERS'S [Dr. Erkan's] resignation as an employee of the said PARK shall become effective immediately". No such repurchase occurred and, instead, the stock was transferred according to the terms of the agreement. The original agreement conditioned the sale of Park Pediatrics' stock on Dr. Erkan's purchase of Dr. Critz's 10-percent interest "in the Stoughton Medical Real Estate Trust". That trust owned the medical building in which Park's offices were located. However, the other holders of trust interests were unwilling to allow Dr. Erkan to purchase Dr. Critz's 10-percent interest and, instead, the trust exercised its right of first refusal with respect to Dr. Critz's interest. An addendum to the agreement struck the provisions concerning the purchase of the trust interest from the contract. In the agreement, Dr. Critz warranted that Park would produce a minimum gross profit of $ 100,000 in the year ending January 2, 1974. In the event that such minimum was not met, the payment due from Dr. Erkan would be reduced by "the amount the said gross earning of the said PARK fell short of the said One Hundred Thousand ($ *538 100,000.00) Dollars". No minimum gross profit was guaranteed for any later year. The agreement further provided that on "the transfer of the STOCK to the BUYER [Dr. Erkan], the SELLER [Dr. Critz] warrants that he will not engage in the practice of pediatric medicine within a radius of fifteen miles of the Town of Stoughton, Mass. for a period of ten years". This limitation on Dr. Critz's right to practice was of great importance to Dr. Erkan, who felt especially vulnerable to competition since he was a foreigner. In fact, this covenant not to compete was, to Dr. Erkan, an essential or indispensable element of the contract. However, despite the essential nature of the term to Dr. Erkan, the agreement did not acknowledge the importance of the covenant. Moreover, the agreement neither specified that the purchase price was paid in part for the seller's covenant nor made an allocation of any portion of the purchase price to the value of the covenant. After the transfer of the stock of Park to Dr. Erkan, the pediatric practice did not change substantially. When Dr. Erkan took over the practice, it remained in the same location as when it was Dr. Critz's practice and for the *539 large part Dr. Erkan used the same equipment and cared for the same patients as did Dr. Critz. At the time Dr. Erkan purchased the stock of Park Pediatrics from Dr. Critz, and thereafter, the corporation's medical practice was located in a modern professional building in Stoughton, Massachusetts. The building housed some 15 medical practices, each of which was engaged in a medical specialty. No other medical building of its size or with so many specialized practices existed in Stoughton at the time. Furthermore, Park Pediatrics was the only pediatric allergy practice in the building and in the Stoughton area. In the Stoughton area, there was at least one hospital in which deliveries were made and from which Park could develop new business. Park was located only about 1/2 a mile from that hospital. Further, Park's location in the medical building was of much benefit to it since it received referrals from doctors in the building who were engaged in other specialties. At the time of the transfer, Park Pediatrics' offices consisted of three examining rooms, one waiting area, and an area for the secretaries. Park Pediatrics rented its office space from the trust and also rented *540 some of the office furniture it used. The assets owned by Park at the transfer consisted of the following: two ophthalmoscopes, an otoscope, a wooden desk and chair, three metal filing cabinets filled with patient records, cash in a bank account, and accounts receivable. The medical equipment could be replaced at a cost close to $ 1,000. The accounts that were due and receivable amounted to between $ 10,000 and $ 15,000. The cash in the bank totalled no more than $ 2,000 or $ 3,000 and was offset in large part by a $ 2,000 debt due Dr. Critz. The three filing cabinets were filled with patient records of a large enough number to keep Dr. Erkan busy. Since his transfer of the stock of Park Pediatrics to Dr. Erkan, Dr. Critz has continued to practice as a pediatrician. Immediately after he left Park, Dr. Critz joined an established pediatric practice in Wareham, Massachusetts. That practice in Wareham was about 30 or 40 miles from Park Pediatrics, yet some of Park Pediatrics' patients sought Dr. Critz's care in Wareham. Later, Dr. Critz practiced in Worcester and in Hyannis, Massachusetts. Both of these offices were more than 25 miles from Park's location in Stoughton, and Worcester *541 is 90 to 100 miles from Stoughton. Since transferring the stock of Park, Dr. Critz has not practiced in the area in which he promised, in his agreement with Dr. Erkan, not to practice. Since the transfer, Dr. Critz has treated his sale of the stock of Park Pediatrics as the sale of a capital asset (stock) resulting in a long term capital gain. In both 1975 and 1976, Dr. Critz treated as capital gain $ 7,258 of the $ 7,497.60 in installments paid him for the stock in each year, and took a $ 3,679 capital gain deduction. By contrast, it is Dr. Erkan's position that he paid a part ($ 46,500) of the contract's $ 67,500 sales price for the covenant not to compete. He did not himself amortize the $ 46,500 allegedly paid for the covenant not to compete, but contends that he transferred the covenant to Park, presumably sometimes in early 1974. Beginning with its tax year 1974, Park Pediatrics then showed the covenant as an asset on its balance sheet and amortized the covenant as if it had acquired the covenant from Erkan at a cost of $ 46,448. [4] It deducted $ 4,645 as amortization of the covenant in 1974, 1975, and 1976. Also in 1974, Park's balance sheet showed an increase in "Loans *542 from stockholders" in the amount of $ 30,797. In 1975, this balance of "Loans from stockholders" went down by $ 5,670; in 1976, it went down by $ 18,250. The Commissioner determined that Park distributed constructive dividends to Dr. Erkan in the amount of $ 6,750 in 1975 and $ 18,250 in 1976. It is Dr. Erkan's position that the payments which the Commissioner has determined to be constructive dividends are really payments by Park to him in consideration of the transfer of the covenant. Dr. Erkan apparently arrived at the price he applied to the covenant by reducing the full price of the stock purchased from Dr. Critz, by an estimate of the value of the assets held by Park. Dr. Erkan determined that the value of Park's assets was $ 21,000; [5] and treated the remainder of the price of the stock as both his cost to purchase the covenant from Dr. Critz and the price at which he transferred *543 it to Park. The Commissioner, in his notices of deficiency, disallowed both the capital gain deductions taken by Dr. Critz and the amortization deductions taken by Park Pediatrics. In the notice sent to Dr. Critz, the Commissioner determined that the amounts reported as "long term capital gain from the sale of the stock of Park Pediatrics Associates, Inc., represent gain from the sale of property which is not a capital asset". In the notice sent to Park Pediatrics, the following explanation for the disallowance of the amortization deductions was given: The $ 4,645 deducted in each of the years 1975 and 1976 for amortization of a covenant not to compete is not allowable since any value of the covenant not to compete is inseparable from the total purchase price *544 provided for under a contract of purchase of all of the issued and outstanding stock of Park Pediatric Associates, Inc. In addition, the claimed deductions are not allowable since you were not a party to the contract of purchase. * * * The Commissioner also included in Dr. Erkan's income the $ 11,500 in payments made by Park to Dr. Erkan in 1976 and the $ 6,750 obligation of Dr. Erkan to Dr. Critz that was paid by Park in both 1975 and 1976. These amounts were included in Dr. Erkan's income as constructive dividends to Dr. Erkan. OPINION The contract before us states explicitly that the seller "agrees to sell the stock and the buyer agrees to purchase the same for * * * $ 65,000 [later increased to $ 67,500]". The consideration thus specified is clearly for the stock. And, although the contract contains a covenant not to compete, no part of the consideration is allocated to that covenant. The contract terms are thus to be construed as "an allocation of all the purchase price to the shares of stock and zero to the covenants." Major v. Commissioner,76 T.C. 239, 247 (1981). In conformity with the language of the contract, petitioner Critz has reported the *545 transaction as a sale of Park's stock giving rise to capital gain computed by treating the full purchase price as the consideration for the stock. Petitioner Erkan, by contrast, has treated the transaction as a purchase of the various assets held by Park Pediatrics and the covenant not to compete. Determining that the value of such assets was $ 21,000, Dr. Erkan allocated the remainder of the $ 67,500 purchase price ($ 46,500) to the covenant. Although good will was obviously a substantial element inherent in the assets of Park, Dr. Erkan did not assign any value thereto. He did not himself amortize the cost of the covenant, but took the position that Park could amortize it after he "assigned" it to Park. Since Dr. Erkan attempts here to obtain the tax benefit of an allocation to the covenant not to compete even though no such allocation is made in his contract with Dr. Critz, he has the burden of showing "by strong proof that the parties intended an allocation to a separately bargained for covenant not to compete and that such an allocation comports with economic realty". Major v. Commissioner,76 T.C. 239, 249 (1981). The present case comes fairly within *546 Leslie S. Ray Insurance Agency, Inc. v. United States,463 F.2d 210, 212 (1st Cir. 1972), decided by the Court of Appeals for the same circuit to which this case is appealable. See also Harvey Radio Laboratories, Inc. v. Commissioner,470 F.2d 118, 119 (1st Cir. 1972), affg. a Memorandum Opinion of this Court; Kreider v. Commissioner,762 F.2d 580, 587 (7th Cir. 1985), affg. a Memorandum Opinion of this Court; Bennett v. Commissioner,450 F.2d 959, 960 (6th Cir. 1971); Balthrope v. Commissioner,356 F.2d 28, 32 (5th Cir. 1966); Annabelle Candy Co. v. Commissioner,314 F.2d 1, 7-8 (9th Cir. 1962), affg. a Memorandum Opinion of this Court; Ullman v. Commissioner,264 F.2d 305 (2d Cir. 1959), affg. 29 T.C. 129 (1957); Lucas v. Commissioner,58 T.C. 1022, 1032 (1972). The intention of the parties at the time they negotiated their contract is of particular significance. Harvey Radio Laboratories, Inc. v. Commissioner,470 F.2d at 120; *547 Leslie S. Ray Insurance Agency, Inc. v. United States,463 F.2d at 212; Annabelle Candy Co. v. Commissioner,314 F.2d at 7; Major v. Commissioner,76 T.C. at 246; Baldarelli v. Commissioner,61 T.C. 44, 50 (1973); Rich Hill Insurance Agency, Inc. v. Commissioner,58 T.C. 610, 617 (1972). We hold that Dr. Erkan has failed to meet his burden of strong proof. Dr. Erkan's testimony showed that during the negotiations he and Dr. Critz (through Dr. Critz's attorney) argued over the distance and the years to be covered by the covenant. It also showed that they negotiated the total consideration under the contract. Dr. Erkan further demonstrated to our satisfaction that the covenant was of considerable importance to him. But he did not establish, by strong proof or otherwise, that the parties to the contract intended that any portion of the purchase price was to be allocated to the covenant, let alone the $ 46,500 allocation which he urges us to adopt here. There was no evidence whatever that they bargained for an allocation of the agreed price for the stock or that they in any way intended to agree *548 upon an allocation of the purchase price to the covenant. Although Dr. Erkan persuasively established that the covenant was a matter of great importance to him, he did not produce any evidence of any such intention on the part of both parties to the contract. Indeed, it is an open question whether Dr. Critz would have consented to an allocation of any positive amount of the then agreed purchase price without further negotiation as to the amount of the price for the stock. Thus, apart from the fact that there was no expressed intention in the contract as to allocation of any consideration to the covenant, Dr. Erkan's position is fatally flawed since there was no evidence whatever to show that "the parties intended to allocate consideration to the covenant". Annabelle Candy Co. v. Commissioner,314 F.2d at 7. Certainly, Dr. Erkan and Park failed to satisfy the strong proof requirement. [6]
*549 The value unilaterally determined by Dr. Erkan to be the covenant's value to him does not establish its value to Dr. Critz or the fair and equitable allocation at which Dr. Erkan and Dr. Critz might arrive if they had bargained for an allocation. See Leslie S. Ray Insurance Agency, Inc. v. United States,463 F.2d 210, 212 (1st Cir. 1972). It is Dr. Erkan's burden to present strong proof that would justify an allocation that varies from the terms of his contract with Dr. Critz. The showing that the covenant was highly important to him simply does not satisfy that burden. [7] See Annabelle Candy Co. v. Commissioner,314 F.2d 1, 7 (9th Cir. 1962). *550 We conclude that Dr. Critz properly treated his sale of the stock of Park Pediatrics as the sale of a capital asset for the entire purchase price, and there is no deficiency in tax as to him. However, Dr. Erkan's deficiency in income tax was was based not on his amortization of the covenant, but on $ 11,500 paid to him by Park Pediatrics in 1976, as well as on $ 6,750 for each of the years 1975 and 1976 paid by Park Pediatrics to Dr. Critz in discharge of Dr. Erkan's obligation to Dr. Critz on the purchase money note. Dr. Erkan claims that the latter amounts determined by the Commissioner to be constructive dividends were actually payments made by Park in consideration of his "assignment" of the covenant to it. And he similarly attempts to classify the $ 11,500 payment as part of the consideration owed to him by Park for his alleged assignment of the covenant to Park. Park's argument that the deficiencies determined against it based on disallowance of its amortization of the covenant are incorrect also depends on whether Dr. Erkan "assigned" the covenant to Park. Thus, in order to resolve the Commissioner's dispute with Dr. Erkan and Park we must take up the alleged transfer *551 of the covenant to Park Pediatrics. It is the position of both Dr. Erkan and Park that Dr. Erkan assigned the covenant not to compete to Park. However, in Dr. Erkan's testimony at trial, he proved to be thoroughly unfamiliar with any details of the transaction, such as the date on which it occurred or the form of the transaction. For example, on examination by Government counsel, he could not say whether in the assignment of the covenant he had, as president of Park Pediatrics, acted for Park as the assignee of the covenant. Additionally, he presented no document that embodied the agreement between himself and Park with respect to the alleged assignment. Instead, he has characterized the transaction as one into which he entered on the advice of his accountant and the details and form of which he simply left to his accountant. Yet, no such accountant responsible for structuring the alleged transaction appeared at trial. On this state of the record, we are hardly persuaded that petitioners Dr. Erkan and Park Pediatrics have shown that any such transfer actually occurred. Instead, their position that a transfer of the covenant was made, appears to have been something of an afterthought, *552 framed after the tax effects of Dr. Erkan's contract with Dr. Critz were understood, and devised as a means of mitigating those effects. Dr. Erkan testified at trial that he and his accountant first discussed his contract with Dr. Critz when it came time to file his 1973 tax return. This apparently occurred in early 1974, shortly before the April 15, 1974, due date for his 1973 return. Similarly, it was only in 1974 that the covenant not to compete appeared as an asset, and the loan from a shareholder appeared as a liability, on Park Pediatric's income tax return. By that time, Dr. Erkan had received the covenant from Dr. Critz at least one year before, in January of 1973. Given these circumstances, and the paucity of direct evidence supporting the occurrence of the transfer, we must conclude that petitioners Dr. Erkan and Park have not met their burden of proving that the transfer occurred. [8] Consequently, Park may not amortize the covenant. Further, since no other explanation for the transfer of funds from Park to Dr. Erkan has been presented, we uphold the Commissioner's determination that they are to be treated as a distribution of profits or constructive dividends to Dr. *553 Erkan. Decision will be entered for the petitioners in docket No. 10776-79. Decision will be entered under Rule 155 in docket No. 12747-79. Decision will be entered for the respondent in docket No. 12748-79.
Footnotes
1. Cases of the following petitioners are consolidated herewith: Kilinc A. Erkan and Ulku Erkan, docket No. 12747-79; and Park Pediatric Associates, Inc., docket No. 12748-79. ↩
2. One other issue relating to an interest deduction in docket No. 12747-79 has been conceded by the Commissioner. ↩
3. The stipulation of facts in this case was filed subject to "the parties' right to object, at the time of trial, to any and all portions of said stipulation and attached exhibits as they may deem to be irrelevant or immaterial." In the stipulation, petitioners George T. and Ruthe E. Critz "reserve[d] a relevancy objection" to three exhibits. They did not then make the objections at trial and the objections have not been mentioned since by either party. We are not sure whether by noting in the stipulation that they reserved objections, petitioners Critz meant thereby to make the objections or whether they meant merely to preserve their right to make the objection at trial. Nonetheless, we have included in our findings only those parts of the exhibits with respect to which objections were reserved, which pertain to "the existence of any fact that is of consequence to the determination of the action." Fed. R. Evid. 401↩. 4. There is an unexplained discrepancy between the $ 46,500 that Dr. Erkan has claimed to be the value of the covenant in the contract between himself and Dr. Critz and the $ 46,448 which Park allegedly paid Dr. Erkan for the covenant and which it has used as its basis for amortizing the covenant. ↩
5. From Erkan's brief it appears that the $ 21,000 figure took into account at least the following: Accounts receivable were approximately $ 15,000. The bank balance was approximately $ 3,000. Park Pediatrics Associates, Inc. owed Critz $ 2,000. The value of medical equipment, included in the sale, is estimated at under $ 1,000.
The $ 2,000 owed Critz was obviously not properly classifiable as an asset. ↩
6. Petitioner Erkan argues that this Court may "determine the value of the covenant independent of the parties' agreement", relying on Wilson Athletic Goods Mfg. Co. v. Commissioner, F.2d 355 (7th Cir. 1955). In Wilson, a business was sold for the total price of $ 570,000 only $ 427,307.70 of which was the subject of specific allocation to assets in the contract. The additional $ 132,692.30 was not allocated to any particular asset or assets. The Tax Court held that since the contract allocated no portion of the sales price to a covenant not to compete the Court would not allocate any part of the $ 132,692.30 to it. The 7th Circuit reversed, determining that the covenant not to compete had a value of $ 132,692.30 and that the purchaser could amortize that amount. Since then, the 7th Circuit has limited the instances in which it will so value a covenant to those situations in which "a party is merely seeking to construe a silent or ambiguous provision in the contract". Kreider v. Commissioner,762 F.2d 580, 586 (7th Cir. 1985). The contract here specifically states that the purchase price is paid for the stock of the seller. Since Erkan "is seeking to establish that the parties intended something other than what is specifically stated in their contract [in the 7th Circuit] * * * the strong proof standard applies". Kreider v. Commissioner,762 F.2d at 586↩. 7. The Fifth Circuit has described the difference in value to the buyer and seller of a covenant not to compete in Better Beverages, Inc. v. United States,619 F.2d 424, 429 (5th Cir. 1980): the interest relinquished by the seller in executing a covenant not to compete is not parallel to that sought or received by the buyer. The value of such a covenant to a purchaser, * * * derives from the projected degree of increased profitability and likelihood of survival of its new enterprise attributable to the insulation of that enterprise, afforded by the covenant, from the deleterious competitive force that the seller could present. Value to the seller, on the other hand, is the measure of his foregoing the opportunity to re-enter a particular market for a given period. Consequently, because they are functions of totally independent sets of considerations, the respective values of the covenant to the buyer and seller are simply unrelated. * * * ↩
8. Moreover, as we have pointed out above, the purely artificial figure of $ 46,500 for the covenant was computed without taking into account the good will of Park Pediatrics which was obviously a very important component of the value of the entire medical practice reflected in Park Pediatrics. ↩