ANSAN TOOL AND MANUFACTURING COMPANY, INC., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Ansan Tool & Mfg. Co. v. Commissioner
Docket Nos. 28256-88, 2092-89
United States Tax Court
T.C. Memo 1992-121; 1992 Tax Ct. Memo LEXIS 142; 63 T.C.M. (CCH) 2212; T.C.M. (RIA) 92121; February 27, 1992, Filed *142 Decision will be entered under Rule 155. Julian L. Berman, S. Richard Fine, and Francis J. Emmons, for petitioner. Marjory A. Gilbert and Jan Lamartine, for respondent. GOFFE
GOFFE
MEMORANDUM FINDINGS OF FACT AND OPINION GOFFE, Judge: The Commissioner determined deficiencies in petitioner's Federal income tax and additions to tax as follows: Addition to Tax
Taxable Year Ended
Deficiency
Sec. 6661
June 30, 1978
$  21,191
n/a
June 30, 1979
1,386
n/a
June 30, 1980
56,353
n/a
June 30, 1981
145,551
n/a
June 30, 1983
81,650
n/a
June 30, 1984
85,773
n/a
June 30, 1985
102,513
$ 25,628.25
The cases were consolidated for all purposes. After concessions by both parties, the remaining issues are: (1) Whether a portion of a payment made to a 50-percent shareholder to purchase his interest in petitioner corporation is allocable to the covenant not to compete contained in the buyout agreement, (2) whether a portion of the payment made to the shareholder to waive a potential claim to a retirement/death benefit is compensation which would entitle petitioner to a deduction; (3) whether legal fees paid by petitioner were deductible as *143 ordinary and necessary business expenses, and (4) whether there was a substantial understatement of income tax due from petitioner for the taxable year 1985, subjecting petitioner to a 25-percent addition to tax. Unless otherwise indicated, all section numbers refer to the Internal Revenue Code in effect for the taxable years ended June 30, 1978, through June 30, 1985, and Rule numbers refer to the Tax Court Rules of Practice and Procedure. FINDINGS OF FACT Some of the facts have been stipulated. The stipulations of facts and exhibits are incorporated by this reference. Ansan Tool and Manufacturing Company, Inc. (Ansan Tool or petitioner), is an Illinois corporation. Its principal office was in Harwood Heights, Illinois, when it filed its petition. Petitioner, an accrual basis taxpayer, operated on a June 30 fiscal year. Petitioner was incorporated in the mid-1940's by Umberto and Mario Anesi for engaging in the business of stamping and assembling metal parts. They immigrated to the United States in 1929. Petitioner's products were sold as component parts to customers who assembled them into other products. In May 1974, petitioner leased a building at 7400 West Lawrence *144 Avenue, Harwood Heights, Illinois (7400 West Lawrence Avenue). It is located about 15 miles northwest of Chicago. The facility at 7400 West Lawrence Avenue permitted petitioner to expand its operation to approximately 50 metal presses. During the taxable years in issue, petitioner had an average work force of 60 employees on its production lines and about 10 management-level employees. Although petitioner specialized in high-volume metal stampings, it also manufactured tools and dies for its customers which were used in the stamping operation. A relatively small portion of petitioner's revenue was generated through the sale of a line of garden products which Mario Anesi created. This product line included garden tools, weather vanes, driveway reflectors, screen repair kits, lawn watering timers, and similar hardware store items. Petitioner had approximately 200 customers for consumer products, the largest of which were Tru-Value Hardware and Ace Hardware, well-known chain stores. Petitioner's revenue was generated in the following proportions: Business Activity
Revenue Range Production (metal stamping)
70 to 75 percent
Tool and die manufacture
10 to 15 percent
Product line (hardware products)
10 to 15 percent
*145 Petitioner's business operation was heavily dependent upon domestic automobile sales because approximately one-half of its metal stamping revenue was related to various products made for clients in the automobile industry. The other half of petitioner's metal stamping business included making components for the manufacturers of appliances, lighting fixtures, and musical instruments. Petitioner's metal stamping business had approximately 25 customers. Petitioner was a family business. Umberto and Mario Anesi each owned a 50-percent interest. Umberto Anesi's two sons, Raymond and Dennis, were employed by petitioner. Raymond worked in the accounting department and Dennis served an apprenticeship as a tool-and-die maker. In July 1970, petitioner's board of directors adopted a resolution to provide retirement and/or death benefits for Umberto and Mario Anesi. Under its terms, Umberto and Mario Anesi were each entitled to a lifetime pension upon retirement equal to 40 percent of their average compensation for their last 5 years of employment and, in the event of death, their spouses were entitled to the same benefit. This benefit was available only to Umberto and Mario Anesi and *146 not to any other officer, director, or employee of petitioner. Umberto Anesi was president of petitioner at the time of his death in March 1971. When he died, Mario Anesi became president and Umberto's son, Raymond, became vice president and a director of petitioner. After Umberto Anesi's death, his 50-percent interest in petitioner was owned by his widow, Ada Anesi, and their two sons, Raymond and Dennis. Pursuant to the retirement/death benefits resolution dated July 1, 1970, Ada Anesi was paid approximately $ 105,000. At all pertinent times, Mario Anesi was primarily responsible for petitioner's sales and marketing activities. Virtually all of the customer relations were handled by him during his tenure as an employee of petitioner. Raymond Anesi, on the other hand, handled general business matters, such as accounting and office management. The following is a summary of the salaries and bonuses paid by petitioner to Mario and Raymond Anesi for the periods indicated: Taxable Year Ended
Mario Raymond
June 30, 1976
$  62,000
$  43,000
June 30, 1977
128,800
118,540
June 30, 1978
153,957
132,556
June 30, 1979
145,253
120,319
June 30, 1980
120,485
95,690
June 30, 1981
60,390
84,100
*147 The $ 60,390 paid to Mario Anesi in the fiscal year ending June 30, 1981, represents less than a full year of compensation due to the termination of his employment on November 3, 1980. Petitioner executed the lease for the building at 7400 West Lawrence Avenue in 1974. Under the terms of the lease, Mario Anesi, and his wife Anita, held an option to purchase the building. In June 1979, Mario and Anita Anesi exercised the option and purchased the building. Title to the property was conveyed to Mario and Anita Anesi. Raymond Anesi, in his capacity as an officer and shareholder of petitioner, consulted with several attorneys and retained Jay A. Slutsky and Guy J. Bacci to represent petitioner in an action against Mario and Anita Anesi for exercising their option to purchase the real estate. A derivative action was initiated on behalf of petitioner which alleged that the option to buy the property at 7400 West Lawrence Avenue should be held by petitioner and the option was never offered to petitioner's board of directors for consideration. The derivative action alleged that the acquisition of the option constituted a breach of trust to petitioner and that Mario and Anita Anesi *148 had usurped a corporate opportunity of petitioner's for their own benefit. The derivative action was filed in November 1979, in the Circuit Court of Cook County, Illinois, by Ada, Raymond, and Dennis Anesi with the assistance of attorneys Guy J. Bacci and the law firm of Weinstein and Bacci, Ltd. Attorney Jay A. Slutsky represented Ada Anesi. The derivative action prayed that: (1) Mario and Anita Anesi be ordered to surrender title to the building to petitioner, (2) an accounting be made by Mario Anesi concerning alleged but unspecified usurpations of corporate opportunities by him, (3) an injunction be entered prohibiting further detrimental conduct by Mario Anesi, and (4) monetary damages be awarded. Mario and Anita Anesi answered the complaint and filed a counter-complaint with the assistance of attorneys James Cotter, John Murry, and Gregory Tumbarello. The litigation was particularly vigorous and acrimonious with both sides, through their attorneys, filing numerous motions, pleadings, and briefs, and making many court appearances. At the same time, however, attorneys for the parties engaged in intense settlement negotiations. During the discussions, it became clear that *149 Mario Anesi's relationship with petitioner would have to be terminated if the litigation were to be settled. On September 2, 1980, the parties reached a tentative agreement which was reflected in a "letter of intent", the substance of which provided that Mario Anesi would be paid $ 1,800,000, with interest, over a period of 5 years, in exchange for his relinquishing all claims against petitioner in the pending derivative action. In addition, Mario Anesi was required to execute a covenant not to compete against petitioner for 5 years and to waive any right to the retirement/death benefits. Finally, petitioner was to execute a new lease for the Harwood Heights property wherein it would have an option to purchase the property for a specific price. This letter of intent also contained a provision in which petitioner agreed to pay both parties' attorney's fees. During the period between September 2, 1980, and November 3, 1980, various drafts of a formal agreement, called the buy-sell agreement, were exchanged among the attorneys for the parties. It was of paramount importance to the plaintiffs in the suit that the covenant not to compete be contained in the final buy-sell agreement *150 due to Mario Anesi's prominent role in petitioner's business. Mario Anesi was petitioner's "rainmaker" in the sense that he attracted and dealt directly with petitioner's customers when he was petitioner's president. After Mario Anesi left his position in September 1980, petitioner's management was concerned that Mario Anesi might accept employment from a rival metal stamping firm and take clients away from petitioner. The buy-sell agreement is double-spaced, consisting of 17 legal-sized (8-1/2 - by 14-inch) pages. The first clause in the agreement provides as follows: 1. SALE OF STOCK
The Purchaser Corporation [petitioner] will purchase and Sellers [Mario and Anita Anesi] will sell all of the Sellers [sic] shares of stock in Ansan for the price of One Million Eight Hundred Thousand Dollars ($ 1,800,000.00)
Portions of the agreement, including the covenant not to compete, are incorporated by reference as exhibits to the agreement. Clause 8 of the buy-sell agreement provides as follows: 8. SELLERS OBLIGATIONS -- RESTRICTIVE COVENANT NOT TO COMPETE
Sellers agree to fully comply with the non-competition agreement attached hereto as Exhibit "J" and made a part *151 of this Agreement.
Exhibit J (the covenant not to compete) provides in full: AGREEMENT
The undersigned, in performance of his obligation pursuant to paragraph 8 of this Agreement dated September 2, 1980 (the Agreement), and in consideration of the execution of said Agreement, and the promises and covenants therein contained, the undersigned hereby covenants and agrees with Ansan Tool & Mfg. Co., Inc., Raymond Anesi, Mary Anesi, Ada Anesi and Dennis Wayne Anesi, that for a period of five (5) years from the closing of the "Agreement", that he will not individually, nor together with any person, firm or entity, whether directly or indirectly on his own account or as a partner of any other person, firm, partnership or corporation, directly or indirectly, in any manner or under any circumstances or conditions whatsoever, be or become interested as a sole proprietor, partner, principal, agent, advisor, consultant, employee, stockholder in a non public held [sic] corporation, officer, director, trustee or in any other capacity whatsoever in the tool and die and stamping business, or in any way in competition with the business hereby agreed to be sold to the Shareholders within *152 a radius that takes into consideration all the present and past customers of Ansan Tool & Mfg. Co., Inc. The undersigned further agrees not to be interested as a shareholder, consultant, advisor or owner of any equity in any such person, firm, partnership or corporation so conducting any such business within such restricted area. The undersigned further agrees not to solicit or deal with the present and past customers of Ansan Tool & Mfg. Co., Inc. going back to the life of the company in the stamping and tool and die business. The parties acknowledge and agree that the restricted period of time and geographic areas set forth in this paragraph is the minimum period of time and area necessary for the protection of Ansan Tool & Mfg. Co., Inc. and its Shareholders in the use and enjoyment of the good will of Ansaan [sic] Tool & Mfg. Co., Inc. Any dispute as to this restrictive covenant, the parties agree that damages can in no way compensate for the injuries sustained and the parties may seek arbitration under paragraph 20 of the Agreement to enforce the rights hereunder. No waiver of any breach or violation shall be implied from the forebearing or failure of Ansan Tool & Mfg. Co., *153 Inc. or its Shareholders to take action hereunder. In regard to the "product line" of Ansan Tool & Mfg. Co., Inc., the Purchaser Corporation, the undersigned agree not to manufacture or sell products of the same design within Ansan Tool & Mfg. Co., Inc. present product line. Only in the event the Shareholders and the Purchaser Corporation have prepaid the Note in full and desire to sell the business, the Shareholders shall upon such prepayment have the right to assign to any third party the restrictive covenant set out herein. The parties further agree that this restrictive covenant and all of its terms and conditions set forth shall survive the payment of the "Note", and that this restrictive covenant shall survive both the closing of this transaction and the payments of the obligations hereunder and shall continue for the full five (5) years. Mario Anesi
The concern of petitioner's management that Mario Anesi might want to compete against it was well founded. After the buy-sell agreement was reached, petitioner's revenue declined substantially. In January 1983, in an effort to restore the financial integrity of petitioner, its attorneys contacted Mario Anesi's attorneys *154 and proposed a lump-sum payoff of the balance then due under the buy-sell agreement. Mario Anesi's attorneys made a counterproposal which included a request that a release from the covenant not to compete be included in exchange for a reduction in the total amount due him. Despite the fact that Mario Anesi had not worked in the tool and die industry for more than 2 years, petitioner's management did not wish to give him the power to compete against petitioner and take away petitioner's customers. As a result of these negotiations, the buy-sell agreement was amended on February 15, 1983, which provided for a lump-sum payment of the total obligation to Mario Anesi of a lesser amount. The amendment also extended for 5 years petitioner's lease and option to purchase the property at 7400 West Lawrence Avenue. Petitioner refused to release Mario Anesi from the covenant not to compete and the covenant was continued in the February 1983 amendment to the buy-sell agreement. In the early 1970's, Mario Anesi suffered a heart attack and had a pacemaker installed. Despite this setback, he enjoyed reasonably good health and worked full time at petitioner until he left in November 1980. *155 His work habits were not diminished by this or any other physical impairment. Mario Anesi continued to be an active businessman after leaving Ansan Tool. He acquired other business interests both while employed by petitioner and after he left, including ownership of two radio stations and interests in a health club and a computer business. Mario Anesi was a successful businessman and a persuasive and effective salesman. Petitioner's management was genuinely concerned that Mario Anesi possessed the ability to do extensive damage to petitioner's business if he were permitted to compete against it. Petitioner amortized $ 876,908 as the cost of the covenant not to compete which it claimed as deductions on its Federal income tax returns for the following periods: Taxable Year Ended
Amount June 30, 1981
$ 154,715
June 30, 1982
185,658
June 30, 1983
169,571
June 30, 1984
169,368
June 30, 1985
169,368
June 30, 1986
28,228
$ 876,908
Petitioner deducted professional fees which were incurred in connection with the buy-sell agreement on its returns for the following periods: Taxable Year Ended
Amount
June 30, 1981
$ 233,032
June 30, 1982
78,947
June 30, 1983
130,488
$ 442,467
*156 The Commissioner, in the statutory notices of deficiency which he mailed to petitioner, disallowed all of the deductions for amortization of the covenant not to compete and the professional fees. He also determined an addition to tax for the taxable year ended June 30, 1985, for substantial understatement of income tax under section 6661. Petitioner claims a deduction of $ 185,000 for cancellation of Mario Anesi's death/retirement benefits. Petitioner also challenges the Commissioner's addition to tax of $ 25,628.25 for its 1985 taxable year for substantial understatement of income tax because it is alleged there was adequate disclosure of petitioner's position and substantial authority for taking the position. OPINION The first issue for our decision is whether any portion of the $ 1,800,000 to be paid to Mario and Anita Anesi pursuant to the buy-sell agreement is properly allocable to the covenant not to compete (sometimes referred to as the covenant). As a preliminary matter, respondent argues that petitioner should not be permitted to introduce any evidence which contradicts the express terms of the buy-sell agreement. Respondent relies upon the general rule that permits *157 the Commissioner of Internal Revenue to hold the parties to the form of their transactions, thereby forcing the parties to accept the tax disadvantages of their own arrangements. Respondent cites Commissioner v. National Alfalfa Dehydrating & Milling Co., 417 U.S. 134, 148 (1974); Gray v. Powell, 313 U.S. 596 (1941); Higgins v. Smith, 308 U.S. 473, 477-478 (1940); Commissioner v. Danielson, 378 F.2d 771 (3d Cir. 1967). Of these cases, only Commissioner v. Danielson, supra, involved a covenant not to compete. A well-established principle of legal construction is that specific rules prevail over more general rules. MacEvoy Co. v. United States, 322 U.S. 102 (1944); Ginsberg & Sons v. Popkin, 285 U.S. 204 (1932); Bigger v. American Commercial Lines, 862 F.2d 1341 (8th Cir. 1988). Therefore, the specific rules established by this and other courts that involve the valuation of covenants for tax purposes supersede the general standard that permits the Commissioner to bind parties to the form of their agreements. Respondent *158 argues that in order to introduce evidence to contradict the express terms of a contract, petitioner must show that the contract in question is the result of a "mistake, undue influence, fraud, duress, etc." Commissioner v. Danielson, supra at 775. This standard has been termed the "Danielson rule". At a minimum, respondent argues that petitioner must produce "strong proof" of the intentions of the parties to a contract when they wish to vary the express terms to their contract, presumably to construe it in a manner which brings some tax savings to them. This standard is often referred to as the "strong proof rule". This precise issue has been visited frequently, and we have rejected "respondent's persistent attempts to persuade this Court to adopt" the Danielson rule. Major v. Commissioner, 76 T.C. 239, 246-247 (1981). See also Elrod v. Commissioner, 87 T.C. 1046, 1065 (1986); Coleman v. Commissioner, 87 T.C. 178, 202 (1986); G C Services Corp. v. Commissioner, 73 T.C. 406, 412 (1979). The Seventh Circuit, to which an appeal in this case would lie, looks to all of *159 the evidence pertinent to the covenant to determine if it has independent value and, if it does, to determine how much the covenant is worth. We are bound to apply this standard to the case before us. Golsen v. Commissioner, 54 T.C. 742, 757 (1970), affd. 445 F.2d 985 (10th Cir. 1971). In Wilson Athletic Goods Manufacturing Co. v. Commissioner, 222 F.2d 355 (7th Cir. 1955), revg. T.C. Memo. 1954-163, the parties did not, in the agreement, allocate a portion of the purchase price to the covenant which clearly possessed some value. We held that the covenant was not severable from goodwill. The Seventh Circuit, using the broad test of substance over form, reversed this Court's holding and stated the following: But in tax matters we are not bound by the strict terms of the agreement; we must examine the circumstances to determine the actualities and may sustain or disregard the effect of a written provision or of an omission of a provision, if to do so best serves the purposes of the tax statute. * * * Therefore, it was the duty of the tax court and is our duty here to ascertain the true intent, insofar *160 as tax consequences are concerned. Consequently, it is immaterial whether the contract did or did not define a specified amount as the value of the covenant. * * * In view of the silence of the contract in this respect, it became necessary to determine then from the other evidence whether the covenant had a value, and if so the amount thereof. Where realistically and actually the covenant has a discernible value, the purchaser, of course, may amortize the price paid for it and claim annual deductions pro rata during the life of the covenant. [Wilson Athletic Goods Manufacturing Co. v. Commissioner, supra at 357.]
Respondent argues that the Seventh Circuit has effectively turned away from the "substance over form" rule which it applied in Wilson Athletic Goods Manufacturing Co. v. Commissioner, supra, and now applies either the strong proof rule or some variation on that test. In support of this argument, respondent cites Kreider v. Commissioner, 762 F.2d 580 (7th Cir. 1985), affg. T.C. Memo. 1984-68. In Kreider, the taxpayers argued that the payment of $ 631,383.80 for the purchase of *161 their trucking business was for a 3-year covenant not to compete and that the payment qualified as personal service income subject to the maximum tax provisions of then-section 1348. This Court allocated one-third of the payment to compensation for services and two-thirds to the covenant not to compete. In affirming this Court, the Seventh Circuit acknowledged that the "intent of the parties and economic realities [as outlined in Wilson Athletic Goods] is not at all inconsistent with approval of the strong proof standard, since the strong proof standard focuses on the same factors." Kreider v. Commissioner, supra at 587. The Seventh Circuit sets forth the circumstances when the strong proof rule should be invoked as follows: The strong proof standard applies only when a party is seeking to establish that the parties intended something other than what is specifically stated in their contract * * *. * * * Wilson Athletic Goods, on the other hand, was a situation * * * where a party is merely seeking to construe a silent or ambiguous provision in the contract. A lesser burden of proof is imposed in the latter situation. See Peterson Machine *162 Tool [v. Commissioner], 79 T.C. at 82. [Kreider v. Commissioner, supra at 586.]
Respondent argues that the plain language of the buy-sell agreement between petitioner and Mario and Anita Anesi clearly states that they will sell all their "shares of stock in Ansan for the price of One Million Eight Hundred Thousand Dollars ($ 1,800,000.00)." Respondent contends that this provision contains the unambiguous intent of the parties to the agreement, and therefore, no other evidence should be permitted to alter such a clear expression. In support of this argument, respondent observes that a valuation of the common stock was performed by Charles Schaeffer, a chartered financial analyst in Chicago called by petitioner as an expert witness, and he valued petitioner's stock at $ 3,650,000 on the date of execution of the buy-sell agreement. Roughly one-half of this amount, or $ 1,800,000, would be the amount petitioner paid Mario and Anita Anesi for their stock; therefore, respondent maintains, any allocation of the $ 1,800,000 to individual items within the buy-sell agreement should not be permitted. Further, respondent elicited testimony *163 at trial to support the fact that the agreed $ 1,800,000 purchase price was arrived at before the buy-sell agreement was physically drafted. Respondent argues, therefore, that because the covenant was not added to the agreement until after the price for the stock had been agreed to by the parties, it would be contrary to the intent of the parties to allocate any of the $ 1,800,000 purchase price to the covenant. Finally, respondent contends that the buy-sell agreement contains default provisions that protect Mario and Anita Anesi in the event petitioner defaults on payments to them of the $ 1,800,000. For example, petitioner's obligation to pay Mario and Anita Anesi must contain a confession of judgment in the event of default. The agreement also contains certain credit standards to which petitioner must adhere. Respondent argues that there is no provision for release of liability on the note should Mario or Anita Anesi compete, as would be expected if the consideration was, in fact, being paid for the forbearance of competition. For these reasons, respondent maintains that no portion of the $ 1,800,000 paid to Mario and Anita Anesi should be allocated to the covenant. *164 Petitioner insists that a substantial portion of this amount was actually compensation to Mario Anesi. Petitioner argues that Mario Anesi was compensated for his promised forbearance of competitive employment. To the extent that petitioner paid for the covenant, it has purchased an intangible asset which is amortizable over its 5-year duration. Sec. 1.167(a)-3, Income Tax Regs. On the other hand, if petitioner paid solely for the stock which Mario Anesi owned, petitioner acquired a nonamortizable capital asset. Major v. Commissioner, 76 T.C. 239, 245 (1981); Lazisky v. Commissioner, 72 T.C. 495, 500 (1979). Upon review of the buy-sell agreement and its attachments we find the opening language of the covenant sufficiently ambiguous to allow petitioner to present evidence to establish the intent of the parties to the agreement. Ellison v. Commissioner, 80 T.C. 378, 394 (1983) (evidence should not be excluded if it is offered to explain the intention of the contracting parties); Estate of Siegel v. Commissioner, 74 T.C. 613, 621 (1980) (evidence should not be excluded if it is offered to interpret *165 the terms of a contract). Even if the terms of the buy-sell agreement were completely clear, petitioner has met its burden by producing the requisite evidence to establish that the parties to the buy-sell agreement required a covenant by Mario and Anita Anesi to be included in the agreement and that petitioner would pay for this protection. As with any contract interpretation matter, we turn first to the actual language of the agreement. The covenant is incorporated into the buy-sell agreement as its exhibit J. The opening language of the covenant expressly provides that it is "in consideration of the execution of [the] Agreement". Thus, by its own language, the covenant recited as an item that the parties to the contract considered it to be paid for. The ambiguity is just how much consideration should be allocated to the covenant. Peterson Machine Tool, Inc. v. Commissioner, 79 T.C. 72, 82 (1982), affd. 54 AFTR 2d 84-5407, 84-2 USTC par. 9885 (10th Cir. 1984). Were we to follow respondent's suggestion that Mario and Anita Anesi wanted the full amount allocated for the sale of the stock, the recitation in exhibit J would be a *166 nullity. It is very clear from the record that petitioner's management considered the covenant an important, if not critical, element of the agreement. Petitioner would not have agreed to pay Mario and Anita Anesi without the protection embodied by the covenant. The covenant, therefore, has an "independent basis in fact [and a ] relationship with business reality such that reasonable men, genuinely concerned with their economic future, might bargain for such an agreement." Schulz v. Commissioner, 294 F.2d 52, 55 (9th Cir. 1961), affg. 34 T.C. 235 (1960). Taken as a whole, the 17-page buy-sell agreement with the 10 supporting exhibits establishes that the $ 1,800,000 was paid by petitioner in exchange for a "package" of items from Mario and Anita Anesi, with each item possessing its own independent economic importance. Thus, although "it is unclear from the contractual terms what specific amount should be allocated to the covenant [] not to compete, some allocation is surely provided for." Peterson Machine Tool, Inc. v. Commissioner, supra at 82 (citation omitted). Respondent makes much of the fact that most, if not *167 all, of the negotiations for the buy-sell agreement and particularly the agreement on the $ 1,800,000 settlement amount occurred before the buy-sell agreement was physically drafted. Respondent observes that there did not seem to be any discussion whatsoever on the inclusion of a covenant; therefore, no amount could reasonably be attributed to it. However, the plethora of uncontroverted testimony convinces us that petitioner would not have entered into the buy-sell agreement if Mario Anesi, the key salesperson, could have engaged in head-to-head competition with it and lured away its most profitable customers. To maintain that petitioner did not consider the covenant to be a valuable and essential component of the buy-sell agreement simply does not reflect "economic reality". Kreider v. Commissioner, 762 F.2d 580, 587 (7th Cir. 1985). We hold, based upon the facts presented and the legal standard applicable in the Seventh Circuit, that petitioner is entitled to present evidence to establish the value of the covenant not to compete contained in the buy-sell agreement dated November 3, 1980. The value ascribed to the covenant must, of course, be properly amortized *168 over the 5-year period during which Mario Anesi agreed not to compete with petitioner. Sec. 1.167(a)-3, Income Tax Regs.
We must now discern the appropriate value of the covenant not to compete. As is typical in valuation cases, both sides present expert witnesses to support their respective positions. Petitioner argues that respondent bears the burden of proof for establishing the proper amount attributable to the covenant which was amortized for the taxable years 1981 through 1984, inclusive. There are two notices of deficiency in this case. Petitioner observes that the deficiency notice disallowing the amounts deducted for the amortization from the taxable years ended June 30, 1981, through June 30, 1984, states that petitioner has "not shown that any portion of the purchase price was allocated to the covenant not to compete, included in your agreement with Mario Anesi and Anita Anesi for their stock in [petitioner.]" The statutory notice covering the taxable year ended June 30, 1985, as it pertains to the amortization of the covenant, holds that the deduction was disallowed because the "requirements of Internal Revenue Code Section 167 have not been met." Petitioner concedes *169 that it has the burden of demonstrating both the right to deduct the amount amortized for the covenant and the amount of the deductions for its taxable year ended June 30, 1985. Rule 142(a). Petitioner argues, however, that respondent bears the burden of proof for the taxable years ended June 30, 1981, through June 30, 1984, inclusive, because the deficiency notice merely challenged petitioner's right to claim the deduction for the amortization; whereas the amount claimed was not questioned. Thus, petitioner maintains that respondent bears the burden of establishing that petitioner's claimed amortization deductions were excessive. Rule 142(a) provides: The burden of proof shall be upon the petitioner, except as otherwise provided by statute or determined by the Court; and except that, in respect of any new matter, increases in deficiency, and affirmative defenses, pleaded in the answer, it shall be upon the respondent.
It is well established that the presentation of a theory which "merely clarifies or develops the original determination without being inconsistent or increasing the amount of the deficiency is not a new matter requiring the shifting of the burden of proof." *170 Achiro v. Commissioner, 77 T.C. 881, 890 (1981); Estate of Jayne v. Commissioner, 61 T.C. 744, 748-749 (1974); McSpadden v. Commissioner, 50 T.C. 478, 492-493 (1968). However, if respondent's argument "either alters the original deficiency or requires the presentation of different evidence, then respondent has introduced a new matter." Achiro v. Commissioner, supra; Estate of Falese v. Commissioner, 58 T.C. 895, 898-899 (1972); McSpadden v. Commissioner, supra.
The position of the Commissioner in the statutory notice of deficiency for the taxable years ended June 30, 1981, through June 30, 1984, inclusive, did not increase the amount of the deficiency, nor did respondent at trial present a theory inconsistent with the statutory notice. The same evidence was required to establish the deductibility of the amount amortized, and petitioner concedes it was not surprised in any way with respect to this issue. Schuster's Express, Inc. v. Commissioner, 66 T.C. 588, 593-594 (1976), affd. 562 F.2d 39 (2d Cir. 1977); Estate of Horvath v. Commissioner, 59 T.C. 551, 555-557 (1973). *171 Accordingly, we reject petitioner's argument that it was presented with new matter which required the placing of the burden of proof on respondent. Respondent presented Robert Schweihs, national director of client services for Valuation Engineering Associates, to value the covenant. Valuation Engineering Associates is a unit of Touche Ross. Mr. Schweihs possesses a master's of business administration from the University of Chicago and a bachelor of science degree in mechanical engineering from the University of Notre Dame. Mr. Schweihs compared the total payoff amount between petitioner and Mario and Anita Anesi with five "guideline" corporations. [1] Mr. Schweihs used the purchase price of these guideline corporations to fashion a ratio between this price and the revenue of each corporation. Using the mean average of the ration, Mr. Schweihs multiplied it by petitioner's sales figure for 1980, which resulted in the total value of petitioner at $ 2,924,000, which he rounded to $ 3 million. With this amount, Mr. Schweihs calculated that Mario and Anita Anesi's 50-percent interest in the common stock of petitioner on the date of the buy-sell agreement was $ 1,500,000, or $ 300,000 *172 lower than the $ 1,800,000 paid to Mario and Anita Anesi in the buy-sell agreement. According to Mr. Schweihs, the value of the covenant could be, at best, no more than $ 1,500,000. His valuation method for the covenant consisted of two approaches: (1) The decrement in value method, and (2) the competitive compensation method. The decrement in value method is an estimation of the reduction in net sales and net profit that would occur if the covenant did not exist. The goal using this method was not to consider sales lost simply due to Mario Anesi's absence, but rather to quantify sales lost due to his active and deliberate competition. Mr. Schweihs concluded that no more than 10 percent of petitioner's net sales for the year following Mario Anesi's departure would be "stolen" if a covenant was not in *173 place. Mr. Schweihs also hypothesized that this 10-percent loss of net sales revenue would be limited solely to the year Mario Anesi left, and that petitioner would be back to its 100-percent sales revenue the year thereafter. The lost sales volume was estimated to be $ 500,000 by Mr. Schweihs, and a profit margin of 10 percent, or $ 50,000, should be attributed to the covenant. Mr. Schweihs went on to describe the second component of his covenant valuation formula as the "competitive compensation method". This is an attempt to determine the "most likely alternative compensation package from a competitor" which might be paid to Mario Anesi. Mr. Schweihs speculated that Mario Anesi could find a similar position working part time earning between $ 40,000 to $ 60,000 per year as a "consultant". Exactly why this calculation was performed or what effect it had on the covenant's value as determined by Mr. Schweihs is unclear and not explained. Mr. Schweihs concluded that the value of the covenant was $ 50,000. Mr. Schweihs' valuation is flawed for several reasons. At the outset, we observe that valuation matters are always subjective. Indeed, "extensive citation of previously *174 decided valuation cases would serve no useful purpose -- each case necessarily turns on its own particular facts." Messing v. Commissioner, 48 T.C. 502, 512 (1967). With this limitation in mind, the Court recognizes that a more narrowly tailored estimation, adjusted with facts particular to the taxpayer whose valuation is under scrutiny, is obviously preferable to a valuation report which is based upon model formulae and abstract mathematical calculations. Unfortunately, Mr. Schweihs' report misses key facts which should have been considered due to the nature of petitioner's operation. For example, Mr. Schweihs' report selected five relatively large publicly traded corporations to serve as guidelines for the price-to-revenue ratio of petitioner, a closely held nonpublicly traded corporation. Mindful of Mr. Schweihs' admonition that "not every firm in the sample will be identical to the subject firm [petitioner]", it appears that the corporations were selected merely because they all had the same Standard Industrial Classification code numbers. Danly Machine Corp. was a leading producer of stamping presses and dies. Petitioner has little to do with making presses *175 or dies, and is largely an end-user of these machines. Mr. Schweihs stated at trial that the only thing he knew about Hobart Corp. was that "They manufacture and sell commercial food equipment." In reality, petitioner's largest customers were in the automotive business, which is an extremely cyclical industry. When questioned about the Ladish Co., Mr. Schweihs only knew that the corporation "manufactured forgings, including fittings, valves, pumps and die casting tools." Again, petitioner's primary business is not the manufacture of tools, but rather it used them to generate 85 to 90 percent of its revenue. Petitioner also had another, smaller product line in which it sold gardening tools for resale to hardware stores. It is not clear whether the five guideline corporations Mr. Schweihs selected had similar structures. Mr. Schweihs noted that all the guideline corporations are classified as belonging in the "metal fabricating industry." At trial, he conceded that Western Gear Corp., another guideline corporation, "[manufactures] printing equipment." It is unclear why this corporation was classified as a member of the metal fabrication industry. Moreover, all of the transactions *176 which Mr. Schweihs relied upon for the purchase-price component of his ratio occurred at least 1 calendar year after the buy-sell agreement was executed. Although these aspects of Mr. Schweihs' report are troubling, what is more problematic is his specific valuation method. Mr. Schweihs did not appear to understand, nor did he consider, the significant position Mario Anesi held at petitioner. At trial, the following colloguy between petitioner's counsel and Mr. Schweihs occurred: Q. So the fact that Mr. Mario Anesi was the sole member of management responsible for sales activity would not in any way affect the value that you assigned to the covenant not to compete? A. That he was the only -- I guess I would have to ask you to define sales. Q. Sales would mean dealing with customers for the purposes of obtaining orders from them. A. If he was the only guy responsible [for] interfacing with customers in a five million dollar business I guess I would be surprised. * * * * Q. If management believed that he [Mario Anesi] could take at least 25 percent of sales would that affect the value you assigned to the covenant? * * * * A. Yes.
Indeed, Mr. Schweihs *177 had not discussed Mario Anesi's departure from petitioner with management to determine whether customers would leave or stay with petitioner. It is also unclear how Mr. Schweihs determined that only 10 percent of sales would be lost if Mario Anesi competed against petitioner, nor why the 10-percent loss would be limited solely to the first year after he left petitioner. Mr. Schweihs described the method he used to arrive at the 10-percent amount as follows: Q. (Petitioner's counsel): Again I don't know where this 10 percent comes from other than your visceral reaction as to what Mario would have done. Is that all it is? A. I don't have an empirical study, no. Q. It's just your visceral reaction, is that correct? A. I don't know if it's a visceral reaction, but it's my assumption I made to calculate the value. Q. So it's your assumption that it would be a 10 percent loss of sales? A. Right. Q. Just merely an assumption? A. Right.
Based upon the report and testimony, we find Mr. Schweihs' valuation to be unreliable. There is no indication that Mr. Schweihs was sufficiently familiar with petitioner's business operation to render an accurate opinion *178 as to petitioner's worth, or the covenant's value. The above-noted flaws, coupled with unexplained "assumptions" made throughout the expert report, require us to reject Mr. Schweihs' conclusions. Petitioner introduced two experts to support alternative valuations: Charles E. Schaeffer, former vice president of Continental Illinois National Bank and Trust Company, worked for 29 years in the estate and trust department, where he was responsible for the valuation of closely held businesses. Mr. Schaeffer holds a bachelor's degree in economics from the University of Notre Dame and a master's of business administration from the University of Chicago. Petitioner also presented Steven R. Friedman, the director of business valuation for Friedman, Einsenstein, Raemer & Schwartz, certified public accountants in Chicago. Mr. Friedman received a bachelor's degree in mechanical engineering and psychology from the Carnegie Mellon University and a master's of business administration from Loyola University in Chicago. Mr. Schaeffer valued the covenant by merely adding Mario Anesi's compensation (salary and bonuses) for a 5-year period from 1976 to 1980 for a total of $ 610,495. He then divided *179 this figure by 60 months to arrive at Mr. Anesi's average monthly compensation of $ 10,175. Mr. Schaeffer projected the average monthly compensation over the 5 years covering the period of the covenant, applying an 11.5-percent discount rate to adjust this figure to present value, thus arriving at $ 462,655 for the value of the covenant. This seems to be a reasonable method for valuing the covenant. In the instant case, however, there are a number of factors which indicate that the severance arrangements between petitioner and Mario Anesi are somewhat unique, and that such a simplistic valuation method does not adequately cover this arrangement. For example, petitioner's management did not merely wish to keep Mario Anesi from competing because it may have resulted in a loss of business. The promissory note which guarantees payment to Mario Anesi is incorporated into the buy-sell agreement as exhibit A. The note sets forth default provisions which include certain required credit standards for petitioner, and a confession of judgment clause if petitioner falls below the credit requirements or if it does not make payments to Mario Anesi. Mario Anesi had been petitioner's principal *180 salesman with exclusive control over the majority of its customers, placing him in substantial control of petitioner's financial viability. It is inconceivable that petitioner would pay him a substantial amount and give him the power to divert former customers. If the buy-sell agreement did not contain the covenant, Mario Anesi could compete against petitioner to the extent necessary to affect its credit standing, thereby triggering a technical default of the agreement to allow him to reacquire petitioner for nominal consideration. [2] The covenant is, obviously, a critical component to the arrangement between petitioner and Mario Anesi. *181 Mr. Schaeffer also valued the retirement/death benefits adopted by petitioner's board of directors in July 1970 as having a present value of $ 185,062. Petitioner argues in its brief that at least $ 185,000 of this amount has been at issue since the date the petitions were filed in these consolidated cases, therefore respondent has "implicitly" accepted $ 185,000 as the minimum value of the retirement/death benefits. Petitioner contends that $ 185,000 of the $ 1,800,000 paid to Mario Anesi under the buy-sell agreement was attributable to a waiver of any claim to the death/retirement benefits; therefore, petitioner may deduct this amount as compensation. The only authority cited for this proposition is section 162(a). In order to be deductible as an expense under section 162(a), a payment must be: (1) Paid or incurred during the taxable year, (2) for the purpose of carrying on any trade or business, (3) an expense, (4) necessary, and (5) ordinary. Brizell v. Commissioner, 93 T.C. 151, 156 (1989); Herman v. Commissioner, 84 T.C. 120, 130-131 (1985). Whether a payment qualifies for deduction under section 162(a) is a factual issue which *182 must be decided on the basis of all relevant facts and circumstances. Commissioner v. Heininger, 320 U.S. 467, 473-475 (1943); Brizell v. Commissioner, supra."Deductions are a matter of legislative grace, and a taxpayer seeking the benefit of a deduction must show that every condition which Congress has seen fit to impose has been fully satisfied." Wisely v. United States, 893 F.2d 660, 666 (4th Cir. 1990) (citing Deputy v. duPont, 308 U.S. 488, 493 (1940)). See also New Colonial Ice Co. v. Helvering, 292 U.S. 435, 440 (1934). The Supreme Court has defined ordinary to mean "normal, usual, or customary," and therefore an expense is not ordinary unless it is "of the type which are common to, or frequently occur in the type of business in which [a taxpayer] is engaged." Deputy v. duPont, supra; Brizell v. Commissioner, supra at 157; Herman v. Commissioner, supra at 131. Petitioner presents no evidence that the retirement/death benefits adopted by the July 1970 board resolution are "normal, usual, or customary" *183 to petitioner's operation in particular, or to the metal stampings industry in general. Mario Anesi's waiver of the death benefits appears to be the result of negotiations for his promise to end all interest he had in petitioner. The death benefits may have been regarded as unnecessary considering the payments he would receive from petitioner. We do not see how this amount can be characterized as an ordinary or necessary business expense for petitioner. Furthermore, section 1.162-10(a), Income Tax Regs., disallows a deduction "under section 162(a) if, under any circumstances, they [the funds paid] may be used to provide benefits under a * * * pension, annuity, * * * or other deferred compensation plan of the type referred to in section 404(a)." The death/retirement benefits at issue here do not satisfy the qualifications set forth in section 404(a). There is no other provision in section 162 or its regulations which permits petitioner to deduct any of this amount as compensation. Therefore, we hold that petitioner is not entitled to any deduction pursuant to section 162 for an amount purportedly paid Mario Anesi as compensation for his waiver of the death/retirement benefits. *184 Turning to Mr. Friedman's testimony and report, we find a more accurate valuation of the covenant between petitioner and Mario Anesi because it fully considers and reflects economic reality between these parties. Mr. Friedman utilized a cash-flow analysis over the 5-year life of the covenant. In establishing the assumptions to be used in determining the covenant's value, Mr. Friedman used income statements and balance sheets of petitioner and determined the importance of Mario Anesi's role in petitioner's operations. Petitioner's management determined that it would lose 40 to 50 percent of its revenue if Mario Anesi had been allowed to compete against it. Mr. Friedman selected the lower figure of 40 percent in revenue decline for the year the buy-sell agreement was signed, and gradually reduced the revenue decline for the remaining 4 years of the covenant, because he assumed that the lost revenue would be gradually replaced by attracting new customers through aggressive sales efforts. Thus, Mr. Friedman assumed the revenue loss would be 35 percent in the second year, 30 percent in the third year, 25 percent in the fourth year, and 20 percent in the fifth year if the covenant *185 was not in place. Mr. Friedman also utilized petitioner's actual cost of goods sold to calculate a percentage of revenues over the 6 years prior to the execution of the buy-sell agreement and its revenue for the 7 years prior to the agreement. From this percentage ratio, Mr. Friedman constructed a linear regression model to measure the projections contained in his report. The regression line closely paralleled Mr. Friedman's projections. In contrast to the methodology used by Mr. Friedman, respondent's expert, Mr. Schweihs, decided to reject the use of petitioner's internal balance sheets and financial drafts because he testified that these documents were "never issued as final audited financial statements." We agree that these documents should not be relied upon with complete trust, yet we feel that they can be of value. At a minimum, internal financial documents shed light upon factors which petitioner's management used when it made important business decisions. There is no reason to believe that the financial documents used by petitioner's management were altered or revised in any manner, nor does respondent contend that they are suspect. The use of the documents for guidance *186 by Mr. Friedman lends credibility to his valuation of the covenant. Mr. Friedman placed the value of the covenant between petitioner and Mario Anesi at $ 932,000 on September 2, 1980. [3] Interestingly, Mr. Friedman's conclusion regarding the total value of Mario and Anita Anesi's 50-percent interest in petitioner is $ 1,065,000. This is $ 735,000 lower than the $ 1,800,000 contained in the buy-sell agreement. This conclusion is not surprising, given the imprecise nature inherent in valuations. This difference could be a premium paid to Mario and Anita Anesi for their interest in this closely held corporation. Similarly, even though Mr. Schweihs' valuation is $ 300,000 lower than the amount petitioner agreed to pay, it is not "wrong" for this reason. This Court has warned parties which insist on asking us to decide valuation matters that it is impossible to infuse "a talismanic precision into an issue which should frankly be recognized as inherently imprecise and capable of resolution only by a Solomon-like pronouncement." Messing v. Commissioner, 48 T.C. 502, 512 (1967). *187 Petitioner argues that the higher value for the covenant by Mr. Friedman is the result of his detailed study of the impact which Mario Anesi's competition would have on petitioner's sales and profitability. This analysis is plausible because of the clause contained in the promissory note which would force petitioner into technical default if it fails at any point to meet minimum credit guidelines. In this instance, petitioner's management is not concerned merely about the loss of customers, but rather, if the covenant were not in place, petitioner's very existence would be at risk. It is logical that a premium would be placed upon the covenant due to the existence of this clause within the note. Mario Anesi was petitioner's president and director which obviously provided extensive control of petitioner. He was directly responsible for petitioner's sales and maintained nearly exclusive relationships between petitioner and its customers. Petitioner was a small, closely held, family-owned and -operated business with only 25 customers in the metal stamping aspect of its operation. Metal stamping generated in excess of 75 percent of petitioner's revenue. A loss of 40 percent of *188 its revenue could force petitioner to violate the credit guidelines set forth in the promissory note. Accordingly, we hold that petitioner has established that the value of the covenant not to compete with Mario Anesi is $ 932,000. The deductions allowable, however, are limited to those claimed on the returns, or $ 876,908. Petitioner did not pray for a finding of overpayment of tax. Respondent criticizes Mr. Friedman's valuation because he did not take into consideration Mario Anesi's age or the fact that he had been fitted for a pacemaker in 1980. Respondent also contends that Mr. Friedman merely assumed, without independent verification, that Mario Anesi was able to and intended to compete against petitioner. We are unpersuaded by this criticism of Mr. Friedman's report. Mario Anesi showed no sign of slowing down his business activities in 1980. Albeit with hindsight, we observe that Mario Anesi's intent to compete was corroborated when he attempted to obtain a release from the covenant in 1983. More importantly, we view the value of the covenant from petitioner's vantage point. Mario Anesi's subjective intentions are not in issue here. Viewing the importance of the *189 covenant from petitioner's standpoint in 1980, the covenant was clearly an essential item. Mr. Friedman's valuation methods were fully supported and logically reasoned. We accept his findings with regard to the value of the covenant. Respondent argues that a valuation of the American Appraisal Co. is entitled to some consideration. This valuation report was performed for Mario Anesi personally to determine petitioner's worth on June 30, 1979, a full year before the buy-sell agreement. The report states that it is "predicated on a 'debt free' analysis of the enterprise." The precise purpose of this valuation was not established and it does not consider a covenant which obviously was not in existence when the report was prepared. There was a suggestion at trial that Mario Anesi may have used this valuation as a starting point for settlement negotiations. The report is simply irrelevant in this case and we must give it no weight. We turn now to petitioner's deduction of professional fees in connection with the negotiation and execution of the buy-sell agreement. Petitioner, in its brief, concedes that $ 23,615 of the professional fees is attributable to the covenant not to compete *190 and should be recovered over its 5-year life. Petitioner also acknowledges that $ 23,617 is related to the redemption of Mario Anesi's stock and, as such, is nondeductible. Petitioner argues that the remaining professional fees of $ 170,816 are still at issue and maintains that these payments were ordinary and necessary business expenses as provided in section 162. Respondent contends that the following professional fees are nondeductible expenditures to acquire a capital asset as provided by section 263 and section 1.263(a)-2, Income Tax Regs.: Attorneys
Fees
Cotter, Murray & Tumbarello
$ 150,000
Guy J. Bacci
56,888
Jay A. Slutsky
11,160
$ 218,048
In United States v. Gilmore, 372 U.S. 39 (1963), the Supreme Court held that in determining deductibility of legal expenses, one must look to the origin and nature of the claim with respect to which the expense was incurred. "If an expense is capital, it cannot be deducted as 'ordinary and necessary'". Woodward v. Commissioner, 397 U.S. 572, 575 (1970). Respondent contends that petitioner merely redeemed its stock from Mario Anesi. A stock redemption is the reacquisition of *191 a corporation's stock from its shareholder in exchange for property. Sec. 317(b). The stock of petitioner is a capital asset. Sec. 1221; Arkansas Best Corp. v. Commissioner, 485 U.S. 212, 222-223 (1988). "It has long been recognized, as a general matter, that costs incurred in the acquisition or disposition of a capital asset are to be treated as capital expenditures." Woodward v. Commissioner, supra at 575. Respondent concedes that, to the extent the Court finds that the covenant possessed value, professional fees attributable to negotiating and finalizing the covenant are properly deductible. As explained above, we have held that petitioner has established the value of the covenant to be $ 932,000. This amount is roughly one-half of the total amount of $ 1,800,000 which the parties agreed to pay Mario Anesi pursuant to the terms of the buy-sell contract. Petitioner, in support of its claimed deduction for professional fees, introduced stacks of attorneys' fee statements. The first set of statements, accompanied with largely indecipherable handwritten entries, was by the Weinstein and Bacci (attorney Guy J. Bacci's) law firm. *192 The following is a representative entry of the typewritten statement: 10/31/80
Meeting with John Murray, Gregory Tumbarello for
negotiations & drafting of final drafts 11:00 -
6:00 p.m. - 7 hrs.
10/31/80
Meeting with Raymond Anesi and Jim Kamen at
Norridge Inn to discuss final documents and
logistics and legalities of closing 7:30 p.m. to
10:30 p.m. - 3 hrs.
Some entries merely say "for professional services" or "deposition". At least the daily entries for attorney Jay A. Slutsky were typewritten, yet the specifics for which petitioner was billed are, at best, ambiguous: Date
Services Rendered
Time
September12
Telephone conference with Tumbarello
.25
12
Office conference with Bacci
1.0 12
Telephone conference with Tumbarello
.25
12
Settlement contract planning and
research
2.0 15
Office conference with Tumbarello
1.0 15
Telephone conference with Bacci
.25
15
Telephone conference with Murray
.25
15
Telephone conference with Bacci
.25
20
Telephone conference with Bacci
.25
20
Telephone conference with Murray
.25
20
Received letter from Bacci
.25
20
Review amended contract proposal
1.0 This bill is representative of the shallow *193 detail of all the professional fee bills submitted to the Court for review. To make matters more complicated, some of the bills predate and some postdate the buy-sell agreement and some carry forward unpaid amounts (with interest and sometimes a "handling fee") for several months. Given the apparent complexity of the negotiations and the insufficient detail of the professional bills submitted, the burden falls heavily upon petitioner to establish the proper allocation of the fees attributable to the covenant. We recognize, however, the practical difficulty that an attorney would encounter in recording his or her time for the various aspects of a given agreement. Upon review of the numerous fee bills submitted, we cannot discern with very much accuracy the amount attributable to the covenant. However, we are convinced that some of the fees are allocable to the covenant. "It is within the purview of this Court to estimate the amount of allowable deductions where there is evidence that deductible expenses were incurred ( Cohan v. Commissioner, 39 F.2d 540 (2d Cir. 1930))". Vanicek v. Commissioner, 85 T.C. 731, 742-743 (1985). Pursuant to *194 this power, we hold that 50 percent of the professional fees in dispute are deductible by petitioner. That is, one-half of $ 218,048 (or $ 109,024) may be deducted by petitioner as attributable to the legal work for the covenant. This 50-percent division comports with and is roughly equivalent to the value of the covenant relative to the overall amount in the buy-sell agreement ($ 932,000 of $ 1,800,000). The remaining amount must be allocated to legal work performed to redeem Mario Anesi's stock, or to other nondeductible capital items contained in the buy-sell agreement. [4]
*195 Finally, we turn to petitioner's contention that it is not liable for an addition to tax pursuant to section 6661 for the taxable year ended June 30, 1985. Section 6661(a) provides for an addition to tax in an amount equal to 25 percent of the amount of any underpayment attributable to a substantial understatement of income tax. Cloud v. Commissioner, 97 T.C. 613 (1991); Pallottini v. Commissioner, 90 T.C. 498 (1988). The amount of the understatement is equal to the excess of the amount of tax required to be shown on the return for the tax year less the amount of the tax shown on the return. Cloud v. Commissioner, supra; Woods v. Commissioner, 91 T.C. 88, 94 (1988). An understatement is substantial if it exceeds the greater of 10 percent of the tax required to be shown on the return or $ 5,000. Sec. 6661(b)(1)(A). The understatement is reduced if it is based on substantial authority or is adequately disclosed on the return or in a statement attached to the return. Sec. 6661(b)(2)(B). In light of our holding that the covenant contained in the buy-sell agreement may be amortized over the 5 *196 years specified, the valuation established by petitioner, and the various other adjustments, a Rule 155 computation must be made to determine whether the resulting understatement exceeds $ 5,000. Should the deficiency exceed this amount, petitioner contends that respondent abused his discretion by not waiving this addition to tax. Congress made respondent's waiver a discretionary act. We should give due deference to respondent's discretion. We have held, however, that this Court has the authority to review respondent's failure to grant a waiver pursuant to section 6661(c). This section provides: (c) Authority to Waive. -- The Secretary may waive all or any part of the addition to tax provided by this section on a showing by the taxpayer that there was reasonable cause for the understatement (or part thereof) and that the taxpayer acted in good faith.
The appropriate standard of review is whether respondent has abused his discretion. Mailman v. Commissioner, 91 T.C. 1079, 1083 (1988). We accord appropriate deference to respondent's determination and uphold the addition to tax for any understatement attributable to items which were not the subject *197 of this case. We have not been presented with the merits of other items in petitioner's return for its taxable year ended June 30, 1985, which may have resulted in a substantial understatement within the meaning of section 6661(a). Accordingly, if an understatement exists, we sustain respondent's imposition of the addition to tax under section 6661(a). To reflect the foregoing, Decisions will be entered under Rule 155. Footnotes
1. The five guideline corporations are Household Finance Corp./Wallace Murray Corp., Armco, Inc./Ladish Co., Dart & Kraft, Inc./Hobart Corp., Ogden Corp./Danly Machine Corp., and Bucyrus-Erie Co./Western Gear Corp.↩
2. Petitioner's management attempted a lump-sum payoff of the buy-sell agreement in early 1983. Mario Anesi made a counter-proposal which requested a release from the covenant. Petitioner's management and Mario Anesi agreed to amend the payment terms, but the covenant was continued in full force. In deciding this case, we have limited ourselves to the information available to the parties on the date the buy-sell agreement was executed, yet Mario Anesi's counter-proposal to release him from the covenant 3 years after that agreement certainly confirms the concerns of petitioner's management that Mario Anesi had a potential interest in competing against the company.↩
3. Mr. Friedman's formula for intangible assets is: FMV = PV + FMV / n x (USPWF) x (t) Where: FMV =
Fair market value
PV =
The sum of the present values of the after-tax
cash flows for the appropriate number of
periods and discount rate
USPWF =
Uniform series present worth factor for the
appropriate period and discount rate
n =
Remaining life
t =
Combined State and Federal taxes.
Or: FMV = $ 622,000 + FMV / 5 x (3.3970) x (49%) = $ 932,000↩
4. There are a number of other nondeductible capital items contained in the buy-sell agreement in addition to the redemption of Mario and Anita Anesi's stock, including a waiver of death benefits, creation of a leasehold arrangement between petitioner and Mario and Anita Anesi, the assignment of life insurance policies to Mario Anesi, and assignment to Mario Anesi of the certificate of title of the vehicle which he then had in his possession.↩